756 A.2d 526

**PARLER & WOBBER, et al.**

v.

**MILES & STOCKBRIDGE, P.C., et al.**

Misc. No. 20, Sept. Term, 1999.

Court of Appeals of Maryland.

July 25, 2000.

672

**674**

Alvin I. Frederick (James E. Dickerman of Eccleston & Wolf, on brief), Baltimore, for appellants.

William J. Murphy (Robert T. Shaffer, III, John J. Connolly of Murphy & Shaffer, on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Pursuant to Maryland Code (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Article (CJP), §§ 12–601, et seq.[1], the

---

1. CJP § 12–603 states:
 The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court

Maryland Uniform Certification of Questions of Law Act, and Maryland Rule 8–305 [2], the United States District Court for the District of Maryland (Smalkin, J.) certified the following questions for our consideration:

I. May a lawyer, who is being sued by a former client for malpractice, obtain contribution or indemnification from a

of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

2. Rule 8–305 states:

(a) Certifying Court. "Certifying court" as used in this Rule means the Supreme Court of the United States, a United States Court of Appeals, a United States District Court, or the highest appellate court or an intermediate appellate court of another State, District, Territory, or Commonwealth of the United States.

(b) Certification Order. In disposing of an action pending before it, a certifying court, on motion of any party or on its own initiative, may submit to the Court of Appeals a question of law of this State, in accordance with the Maryland Uniform Certification of Questions of Law Act, by filing a certification order signed by a judge of the certifying court. The certification order shall state the question of law submitted, the relevant facts from which the question arises, and the party who shall be treated as the appellant in the certification procedure. The original order and seven copies shall be forwarded to the Court of Appeals by the clerk of the certifying court under its official seal, together with the filing fee for docketing regular appeals, payable to the Clerk of the Court of Appeals.

(c) Proceeding in the Court of Appeals. The filing of the certification order in the Court of Appeals shall be the equivalent of the transmission of a record on appeal. The Court of Appeals may request, in addition, all or any part of the record before the certifying court. Upon request, the certifying court shall file the original or a copy of the parts of the record requested together with a certificate, under the official seal of the certifying court and signed by a judge or clerk of that court, stating that the materials submitted are all the parts of the record requested by the Court of Appeals.

(d) Decision by the Court of Appeals. The written opinion of the Court of Appeals stating the law governing the question certified shall be sent by the Clerk of the Court of Appeals to the certifying court. The Clerk of the Court of Appeals shall certify, under seal of the Court, that the opinion is in response to the question of law of this State submitted by the certifying court.

successor lawyer stemming from the successor's malpractice or negligent representation of the same client in the same matter?

II. May the first lawyer referred to above maintain such an action against the second lawyer when the former claims that the second lawyer negligently advised the client to settle the underlying case?

We respond in the affirmative to both questions.

## STATEMENT OF FACTS

Our response to the certified questions begins with the following factual background supplied by the U.S. District Court:

*Introduction*

This case stems from the tortured morass which asbestos litigation has become.[ ] The Plaintiff in this case [before the District Court] is Royal Insurance Company of America ("Royal"). Royal insured Salomon, Inc. Royal, as Salomon's insurer, hired Miles [ & Stockbridge, P.C.] to defend Salomon in a lawsuit filed by Corinne Jerome in Baltimore City Circuit Court (the "Jerome litigation"). (Jerome had previously filed suit against Salomon in New York.) Jerome initiated the Maryland suit to recover damages stemming from her husband's alleged exposure to asbestosis. Miles represented Salomon for a short time in the initial stages of the Jerome litigation. As will be discussed in more detail below, Royal eventually discharged Miles and retained Parler [ & Wobber] to represent Salomon. By that point, a default had been lodged against Salomon in the Jerome litigation. Eventually, Royal, on the advice of Parler, decided to settle the Jerome litigation for approximately $1.6 million.

Royal is now suing Miles for malpractice, seeking over $1.6 million in damages (the "Royal litigation"). Royal claims that it was forced to settle the Jerome litigation due to Miles' negligence in allowing a default judgment to be entered against it. Miles has answered and denies liability.

In addition, Miles has filed a third-party complaint against Parler, in essence seeking a contribution from it in case Miles is held to be liable to Parler [Royal]. Miles claims that Parler also acted negligently in its representation of Royal and either was the proximate cause of, or added to the extent of, the damages Royal suffered. Parler now argues in its motion to dismiss Miles' Third Party Complaint that it cannot be held liable, as a matter of law, to Miles in this situation.

*The Jerome Litigation*

This case started with a run-of-the-mill asbestosis lawsuit. Apparently, Jerome originally initiated suit in New York. According to Parler, she decided also to file in Maryland because she was worried that she would have statute of limitations problems in New York. Accordingly, she filed suit in Baltimore City Circuit Court in the fall of 1997, naming Salomon as defendant. According to Parler, service was affected on Salomon through its resident agent. No answer was originally filed and an initial Default Order and Notice of Default was issued in December, 1997.

Salomon then notified Royal of the lawsuit. Royal in turn hired Miles to defend the case on behalf of Salomon. Miles filed a motion to vacate the Default Order, which was granted by the Baltimore City Circuit Court in January, 1998. Rather than responding to the Complaint at that point, Miles removed the case to the United States District Court for the District of Maryland. (It is at this point that Miles' actions become the subject of the Royal litigation). Judge Blake, of this Court, remanded the case to the Baltimore City Circuit Court.

Apparently, Miles assumed that the removal proceeding would stay the Circuit Court's timely filing deadline for Salomon's Answer. It did not. Upon remand to the Circuit Court, Jerome filed a Motion to Enter a Default Judgment. Miles answered the Jerome Complaint the next day (well past the original date it was due following the vacation of the first Default Order). On May 8, 1998, the Baltimore City Circuit Court, Angelletti, J., granted Jerome's motion

for Default Judgment. Miles unsuccessfully attempted to have that order reconsidered by Judge Angelletti, but he denied Salomon's motion to vacate his order in August, 1998.

Soon after this failure of reconsideration, Royal discharged Miles and retained Parler, which entered its appearance in the Circuit Court on September 28, 1998. Previously, Miles had failed to identify third party defendants (the list was due on September 21, 1998). Parler in turn failed to file any third party complaints before the deadline of October 5, 1998. The parties dispute whether Miles' failure to identify third party defendants would act as a bar to Parler actually filing third party complaints. Over the next several months, Parler attempted to have Jerome's suit dismissed, relying primarily on arguments that the dismissal of Jerome's New York suit on statute of limitations grounds should have *res judicata* effect in Maryland and that a release Jerome had previously signed absolved Salomon of any liability. These efforts, including a denied request for a writ of mandamus from the Court of Appeals of Maryland, were unsuccessful. According to Miles, Parler never specifically requested the Circuit Court to vacate its default order. Instead, Miles alleges, Parler erroneously conceded the binding effect of the Court's default judgement [sic]. While Salomon's motion for summary judgment on the basis of Jerome's release was pending, Royal, allegedly on the advice of Parler, settled with Jerome for $1.6 million.

*Malpractice Claims*

Royal initiated this lawsuit by alleging malpractice by Miles. Specifically, it claims that Miles committed malpractice when it: 1) allowed a default judgment to be entered against Salomon in the Jerome litigation; and 2) failed to identify third party defendants before the September 21, 1998 deadline issued by the Baltimore City Circuit Court. Royal asserts that Miles' negligence proximately caused Royal to settle with Jerome for $1.6 million, despite Parler's

efforts to avoid the effect of the default order. Royal has not sued Parler for malpractice.

Miles filed a third-party complaint against Parler. Miles alleges three specific acts of negligence in Parler's representation of Salomon: 1) it failed to argue either to the Circuit Court or on appeal (via the writ of mandamus) the appropriate liberal standard for the vacation of an entry of a default order before it becomes a final default judgment [3]; 2) that Parler could have filed third-party complaints, but failed to do so, before October 5, 1998; and 3) that Parler negligently advised Royal to settle the Jerome litigation far in excess of any reasonable settlement value. As a result of this negligent representation, Miles claims that it is entitled to contribution and/or indemnification from Parler for any liability it has towards Royal. (Miles also raises these issues as a defense to Royal's claim.) [4]

---

**3.** In a footnote addressing this particular issue, the District Court elaborated that:

This is Miles' principal claim, so it deserves additional explanation. Miles contends in its complaint and its response to Parler's Motion To Dismiss that Parler could have had the default order vacated by arguing the correct legal standard (as Miles interprets it) for vacation of a default order to the Circuit Court. Parler, Miles alleges, essentially conceded the default judgment in its two subsequent motions for summary judgment, a critical error on Parler's part. Had Parler simply argued the correct (liberal) standard for vacating default orders, a default judgment would not have been entered and there would have been no reason for Salomon to settle with Jerome, especially since the paper Jerome signed in the related New York litigation would have acted as a complete bar to recovery in the Maryland litigation.

**4.** The District Court stated in a footnote that:

As noted above, all of the parties apparently agree that Jerome did in fact execute a release which would have been dispositive of her suit against Solomon [sic]. It is not clear when the release came to the attention of any of the present parties—Royal, Miles or Parler. In any event, the fact that this procedural nightmare could have occurred, costing somebody $1.6 million to settle a case which should have been barred, is symptomatic of the problems with modern day mass tort litigation. In this case, Ms. Jerome apparently initiated several lawsuits against several defendants in different states. The courts in one state did not know what the courts in another state were doing, or how resolution in one state would affect the suit in the

## I.

Under the Certified Questions of Law Act, this Court's statutorily prescribed role is to determine only questions of Maryland law, not questions of fact. *See Reed v. Campagnolo*, 332 Md. 226, 228, 630 A.2d 1145, 1146 (1993); *Food Fair Stores, Inc. v. Joy*, 283 Md. 205, 219, n. 7, 389 A.2d 874, 882 (1978); *Mercantile–Safe Deposit and Trust Co. v. Purifoy*, 280 Md. 46, 55, 371 A.2d 650, 655 (1977). For purposes of our analysis, we accept the facts as submitted by the certifying court. *See Reed*, 332 Md. at 228, 630 A.2d at 1146; *Food Fair Stores, Inc.*, 283 Md. at 219, n. 7, 389 A.2d at 882. Furthermore, we confine our legal analysis and final determinations of Maryland law to the questions certified. *See Reed*, 332 Md. at 228–29, 630 A.2d at 1146; *Toll v. Moreno*, 284 Md. 425, 437, 397 A.2d 1009, 1015 (1979).

We are presented with an issue of first impression in Maryland: when a client sues former counsel for professional malpractice, may that former counsel implead the client's successor counsel for contribution and indemnification where it alleges that successor counsel's professional negligence in the same matter contributed to the injury suffered by the client? We hold that such a claim may be maintained. In so holding, we must resolve two competing interests: the right for a joint tortfeasor to seek contribution or indemnification from an assertedly common liable party and the need to protect the attorney-client privilege.

Miles argues that it has a statutory right to implead Parler for contribution or indemnification under the Maryland Uni-

---

other state. Unfortunately, the parties did not help resolve the situation. This matter was made worse when alleged procedural mistakes blossomed into case-ending judgments not based on merits. Simply put, our system of adjudication is not up to the task of justly, efficiently or effectively handling mass tort litigation where the number of plaintiffs and defendants is enormous and there are no reliable ways to determine which defendant is or is not liable for the specific injuries of which plaintiff. The system is broken, as this litigation proves, but apparently because everyone is vested in it, no one is trying hard to fix it.

form Contribution Among Tort–Feasors Act ("UCATA"), Maryland Code Annotated (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Article, §§ 3–1401, et seq.[5], which contains no express recognition of or exception for the attorney-client privilege issue, and attendant ethical implications, presented here. It asserts that the very purpose of UCATA is served by its impleader action because the statute "ensures that the costs of injuries is distributed fairly among joint tort-feasors by allowing defendants an opportunity to assert a claim that the plaintiff for whatever reason has not asserted on his own. The plaintiff still may choose whom to name as a defendant, but the defendant may then seek contribution from those tortfeasors ignored by the plaintiff."

Parler, in reply, argues that despite UCATA's provisions, for public policy reasons, it cannot be liable to Miles for contribution or indemnification in cases where the common client sues former counsel for malpractice, but not successor counsel. Parler asserts that an impleader action by former counsel against its successor would breach the attorney-client

---

**5.** The pertinent provisions of UCATA are as follows:

§ 3–1401. Definitions.

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Injured person.*—"Injured person" means any person having a claim in tort for injury to person or property.

(c) *Joint tort-feasors.*—"Joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

§ 3–1402. Right of contribution.

(a) *In general.*—The right of contribution exists among joint tort-feasors.

(b) *Discharge of liability or payment of share.*—A joint tort-feasor is not entitled to a money judgment for contribution until the joint tort-feasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability.

(c) *Effect of settlement.*—A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

§ 3–1403. Judgment against one tort-feasor.

The recovery of a judgment by the injured person against one joint tort-feasor does not discharge the other joint tort-feasor.

relationship by invading the successor attorney's duty of confidentiality owed to the client and the attorney-client privilege. In particular, "allowing such a claim would create a potential conflict between the interests of the client and the inherent self-protection instinct of the successor attorney." In essence, Parler warns that if this Court allows Miles' impleader action under UCATA, we will open Pandora's box by providing a third party with the right to interfere in the sacred attorney-client relationship.

In contrast, Miles stresses that successor counsel, if given immunity from such a suit, could abuse its position and insulate its conduct in cases where its negligent representation of the client contributes to or exacerbates the client's loss and that allowing a suit under UCATA only will further stimulate current counsel's duty to act diligently in its representation. Miles further requests that we adopt the legal notion that once a former client sues its former counsel, all privileges and immunities between those parties and between the client and successor counsel are waived in all matters relating to the malpractice suit.

## A.

UCATA has deep historical underpinnings. At common law, Maryland generally recognized indemnification only in cases where a wrongful act of a party imposed liability on a third party; in such instances the latter could seek indemnification from the party actually guilty of the wrongful act. *See Baltimore & O.R. Co. v. County Comm'rs of Howard County,* 113 Md. 404, 414, 77 A. 930, 933 (1910). Among negligent joint tortfeasors, however, courts, lost in dogmatic ritual, stubbornly refused to recognize a common law right of contribution.[6] *See Franklin v. Morrison,* 350 Md. 144, 154, 711

---

6. One treatise states that the distinction between indemnification and contribution is only skin deep:

In American jurisdictions in general, the allocation of damages among multiple tortfeasors has historically been analyzed in terms of two, ostensibly mutually exclusive, doctrines: contribution and in-

A.2d 177, 182 (1998); *Montgomery County v. Valk Mfg. Co.*, 317 Md. 185, 190, 562 A.2d 1246, 1249 (1989) (discussing *Baltimore & O.R. Co.*, 113 Md. at 414, 77 A. at 933). The seed for this prohibition was planted in the case of *Merryweather v. Nixon*, 8 Term. Rep. 186, 101 Eng. Rep. 1337 (1799).

In *Merryweather*, the culpable parties collectively acted intentionally against, and caused harm to, the plaintiff, but one of the wrongdoing parties was prohibited from seeking recovery against the other. *See Valk Mfg. Co.*, 317 Md. at 189, 562 A.2d at 1248. The reasoning underlying *Merryweather* was that no party who acted wrongfully and intentionally against the injured plaintiff should be able to recover anything as a result of that party's actions. *See id.* American courts, perhaps arbitrarily, if not illogically, extended *Merryweather* to bar negligent joint tortfeasor contribution actions. *See* 3 Fowler V. Harper, et al., The Law of Torts § 10.2, at 40 (1986 and 1998 Supp.)("*Merryweather v. Nixon* involved deliberate and intentional acts by the tortfeasor and thus, as a precedent, does not support the broad proposition for which it is so frequently cited in the American cases"). The application of *Merryweather*'s reasoning to multiple negligent tortfeasor situations results in the following scenario:

> [W]hen the plaintiff enforced a joint and several judgment entirely against A, A was not allowed to recover contribution from B for any part of what he had paid. The result

---

demnification. In traditional terms, the apportionment of loss between multiple tortfeasors has been thought to present a question of contribution; indemnity, by contrast, has traditionally been viewed as concerned solely with whether a loss should be entirely shifted from one tortfeasor to another, rather than whether the loss should be shared between the two. Competent judicial authority has noted that the dichotomy between the concepts of contribution and indemnity "is more formal than substantive." The common goal of both doctrines is the equitable distribution of loss among multiple tortfeasors. Contribution, says the unanimous Washington court of last resort, "is a remedial scheme which operates exclusively between or among tort-feasors. It has no effect upon the *injured party's initial right to recover from the multiple tort-feasors*."

1 Stuart M. Speiser, et al., The American Law of Torts § 3:15, at 423–24 (1983, 2000 Supp.)(emphasis in original).

was that although both A and B were at fault, A paid all the damages and B paid none. The rule grew up in the day when joint and several liability applied only to tortfeasors who acted in concert to carry out intentional torts. In that setting, denial of contribution was equivalent to saying that an intentional tortfeasor cannot use the courts to enforce an equitable loss sharing.

Dan B. Dobbs, The Law of Torts § 386, at 1078 (2000). *Merryweather*'s extension to bar negligent joint tortfeasor contribution actions came under sharp attack from courts and commentators:

There is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were equally, unintentionally responsible, to be shouldered onto one alone, according to the accident of a successful levy of execution, the existence of liability insurance, the plaintiff's whim or spite, or the plaintiff's collusion with the other wrongdoer, while the latter goes scot free.

*Valk Mfg. Co.*, 317 Md. at 189, 562 A.2d at 1248 (citing Prosser and Keeton on Torts § 50, 337–38 (5 th ed.1984)). *See also* 1 Stuart M. Speiser, et al., The American Law of Torts § 3:17, at 433 (1983 and 2000 Supp.). Another unjust effect of the *Merryweather* extension was that it permitted the plaintiff, at his or her whim, to determine who should bear the costs of damages. *See Valk Mfg. Co.*, 317 Md. at 195, 562 A.2d at 1251.

In Maryland, legislative action was taken to expunge the inherent injustices of the *Merryweather* rule as it applied to contribution claims between negligent tortfeasors. *See Valk Mfg. Co.*, 317 Md. at 189–90, 562 A.2d at 1248–49; Dan B. Dobbs, The Law of Torts § 386, at 1078 (2000); 1 Stuart M. Speiser, et al., The American Law of Torts § 3:19, at 446–50 (1983 and 2000 Supp.). Through UCATA's enactment in 1941 "a statutory right of contribution among joint tortfeasors was created which did not exist at common law." *Central GMC, Inc. v. Helms*, 303 Md. 266, 276, 492 A.2d 1313, 1318 (1985). *See also Valk Mfg. Co.*, 317 Md. at 190, 562 A.2d at 1248–49.

Furthermore, the unfairness of allowing a plaintiff the power to pick and choose whom to sue for damages was alleviated by providing the defendant with the right to implead a responsible third party to share in the liability.[7] This "distribute[s] the burden of responsibility equitably among those who are jointly liable." *Valk Mfg. Co.*, 317 Md. at 189–90, 562 A.2d at 1248.

Under UCATA, joint tortfeasors are defined as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." CJP § 3–1401(c). *See also Valk Mfg. Co.*, 317 Md. at 191, 562 A.2d at 1249; *Central GMC, Inc.*, 303 Md. at 276, 492 A.2d at 1318. We have held that, in situations where only one potential defendant is sued by a plaintiff, that defendant's right to contribution from a third party is predicated on the impleaded party's direct liability to the plaintiff. *See Valk Mfg. Co.*, 317 Md. at 193, 562 A.2d at 1250. This means that as between a defendant and an impleaded party, there must be common

---

7. Procedurally, UCATA originally recognized an impleader action of third parties in common liability with a defendant, but that provision has since been removed from UCATA and is now regulated by Maryland Rule 2–332. *See Valk Mfg. Co.*, 317 Md. at 191, 562 A.2d at 1249. "The goals of the procedural device, however, remain the same. 'The purpose of the third party practice provided for by the [UCATA] and by the Rules which have superseded it [is] to try in one action all phases of litigation among the original and impleaded parties....'" *Valk Mfg. Co.*, 317 Md. at 191, 562 A.2d at 1249 (citing *Stem v. Nello L. Teer Co.*, 213 Md. 132, 144, 130 A.2d 769, 775 (1957)). *See also Porter Hayden Co. v. Bullinger*, 350 Md. 452, 473, 713 A.2d 962, 972 (1998). We noted the importance of impleading as "an outgrowth of what was found to be a defect in the common law. There were frequent cases where it was necessary to give relief to a defendant when he [or she] had a genuine claim for exoneration against some person not a party to the suit." *Northwestern Nat. Ins. Co. v. Samuel R. Rosoff, Ltd.*, 195 Md. 421, 425, 73 A.2d 461, 462 (1950). The purpose of impleader is "to simplify and expedite proceedings and to avoid the useless duplication, expense and possible uncertainty of more than one trial." *Allen & Whalen, Inc. v. John C. Grimberg Co.*, 229 Md. 585, 587, 185 A.2d 337, 339 (1962). *See also Cotham v. Board of County Comm'rs for Prince George's County*, 260 Md. 556, 566, 273 A.2d 115, 120 (1971)(impleader allows for more consistent judgments on related claims); *Bradyhouse v. Levinson*, 230 Md. 519, 523, 187 A.2d 838, 840 (1963).

liability in tort to an injured person. *See Valk Mfg. Co.*, 317 Md. at 192, 562 A.2d at 1249; 1 Stuart M. Speiser, et al., The American Law of Torts § 3:21, at 455 (1983, 2000 Supp.). Courts and commentators have been careful to note a distinction between common liability and joint negligence. "Contribution rests on common liability, not on joint negligence or joint tort. Common liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds." *Pautz v. Cal–Ros, Inc.*, 340 N.W.2d 338, 339 (Minn.1983). *See also* 1 Stuart M. Speiser, et al., The American Law of Torts § 3:21, at 455–56 (1983, 2000 Supp.). In this sense, contribution is derivative in nature rather than a new cause of action. *See Valk Mfg. Co.*, 317 Md. at 192, 562 A.2d at 1249–50.

■ Because common liability requires no concerted negligence, the tortious conduct among joint tortfeasors leading to a plaintiff's harm may be concurrent. *See Trieschman v. Eaton*, 224 Md. 111, 115, 166 A.2d 892, 894 (1961). It has been noted aptly that:

> this requirement of common liability does not necessarily restrict the right to recover contribution to such cases as those in which the liability is imposed for some *single* act of tortious commission or omission in which all the tortfeasors concerned joined. This aspect usually arises in negligence cases. For a right to contribution to exist among tortfeasors guilty of negligence, it is not ordinarily essential that there be joint negligence in the sense that all the wrongdoers fail in the performance of an identical duty; contribution may be had among independent tortfeasors whose combined negligence, or whose omission of separate acts of care at the same instant, concur and contribute to the same injury.

1 Stuart M. Speiser, et al., The American Law of Torts § 3:21, at 456–57 (1983, 2000 Supp.)(emphasis in original).

It is from this statutory cause of action, and its historical underpinnings, that Parler wishes to carve an exception that it perceives will avert a threat to the attorney-client relationship.

## B.

Confidentiality is a core value in the attorney-client relationship. The duty of confidentiality of information is enshrined in the Maryland Rules of Professional Conduct ("RPC"). Rule 1.6(a) states that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b)." The reasoning behind this confidentiality is explained by the RPC 1.6 Comment:

The observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client not only facilitates the full development of facts essential to proper representation of the client but also encourages people to seek early legal assistance.

Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and correct. The common law recognizes that the client's confidences must be protected from disclosure. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.

A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is thereby encouraged to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter.

The principle of confidentiality is given effect in two related bodies of law, the attorney-client privilege (which includes the work product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics.

See also 2 Ronald E. Mallen and Jeffery M. Smith, Legal Malpractice § 14.5, at 242 (4th ed.1996); Noble v. Bruce, 349 Md. 730, 758, 709 A.2d 1264, 1278 (1998)(confidentiality blocks interference with an attorney's duty of loyalty to a client, avoids situations that compromise an attorney's ability to

zealously advocate on behalf of a client, and prevents forced attorney disclosures of confidences that the client may not have wanted revealed).

There are notable exceptions under RPC 1.6(b), however, which make the rule of confidentiality not absolute:

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another;

(2) to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used;

(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal charge, civil claim, or disciplinary complaint against the lawyer based upon conduct in which the client was involved or to respond to allegations in any proceedings concerning the lawyer's representation of the client[;or]

(4) to comply with these Rules, a court order or other law.

There is a critical distinction, not acknowledged clearly by Parler, between confidentiality required by ethical rules and the evidentiary basis of the attorney-client privilege. More protection is provided to communications within the attorney-client relationship under one than the other. The confidentiality umbrella of the ethical rule encompasses "all situations *except* where the 'evidence is sought from the lawyer through compulsion of law.'" *In re Criminal Investigation No. 1/242Q*, 326 Md. 1, 5, 602 A.2d 1220, 1222 (1992)(citing RPC 1.6 Comment)(emphasis in opinion). "In the latter situation, only the attorney-client privilege, not the broader rule of confidentiality, protects against disclosure." *Id.* Thus, relevant evidence sought through discovery, unless protected by the attorney-client privilege, must be produced and the

ethical duty of confidence takes a back seat to the quest for truth. Stated differently, the search for truth is paramount to just disposition of cases in controversy and Maryland's broad discovery rules take precedent over the attorney's ethical duty of confidentiality unless protected by law. *See E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 405, 718 A.2d 1129, 1133 (1998)(discovery rules promote liberal disclosure); *Berrain v. Katzen,* 331 Md. 693, 697, 629 A.2d 707, 708–709 (1993)(disclosure of all facts promotes fairness and sound administration of justice).

■■■ The attorney-client privilege is carefully guarded by the courts. It is " 'the oldest of the privileges for confidential communications known to the common law.' " *E.I. du Pont de Nemours & Co.,* 351 Md. at 414, 718 A.2d at 1133 (citing *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981)). *See also Harrison v. State,* 276 Md. 122, 131, 345 A.2d 830, 836 (1975)(explaining that the privilege extends at least as far back as the reign of Elizabeth I (1558–1603)). Generally, the attorney-client privilege bars compelled disclosure, without the client's consent, of attorney-client communications made in confidence between the attorney and client. *See In re Criminal Investigation No. 1/242Q,* 326 Md. at 5, 602 A.2d at 1221–22; *State v. Pratt,* 284 Md. 516, 519, 398 A.2d 421, 423 (1979); *Harrison,* 276 Md. at 133–34, 345 A.2d at 837. It is codified in Maryland Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceeding Article § 9–108, which provides that "[a] person may not be compelled to testify in violation of the attorney-client privilege." The privilege is grounded in the public policy of encouraging a client to consult freely with and seek legal advice from an attorney without fear of the attorney being forced to testify or produce evidence as to the confidences in various judicial or other proceedings. *See In re Criminal Investigation No. 1/242Q,* 326 Md. at 5, 602 A.2d at 1221–22; *Pratt,* 284 Md. at 520, 398 A.2d at 423; *Harrison,* 276 Md. at 134, 345 A.2d at 837. It is this uninhibited sharing of information between client and attorney that aids an attorney in effective representation and reinforces the legal profession's overall integrity. *See United*

*States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). Moreover, it has been noted that, while never granted express constitutional lineage in criminal cases, the privilege is linked to the constitutional guarantee of effective assistance of counsel and that strict limitations on its application could undermine this basic guarantee. *See Pratt,* 284 Md. at 520, 398 A.2d at 423; *Harrison,* 276 Md. at 135, 345 A.2d at 838.

This Court has adopted Wigmore's definition of the privilege:

(1) Where legal advice of [any] kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection [may] be waived.

*E.I. du Pont de Nemours & Co.,* 351 Md. at 415, 718 A.2d at 1138 (citing *Harrison,* 276 Md. at 135, 345 A.2d at 838, quoting 8 John H. Wigmore, Wigmore on Evidence § 2292, at 554 (McNaughton rev. ed.1961)).

The attorney-client privilege is not absolute and "is not an inviolable seal upon the attorney's lips." *Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444, 446 (S.D.Fl.1980) (citing *Laughner v. U.S.,* 373 F.2d 326, 327 (5th Cir.1967)). Invocation of the privilege can create evidentiary inequities between parties during discovery and the absence of fact and truth at trial. "Because the application of the attorney-client privilege withholds relevant information from the fact finder, the privilege contains some limitations and should be narrowly construed." *E.I. du Pont de Nemours & Co.,* 351 Md. at 415, 718 A.2d at 1138.

Only the client has power to waive the attorney-client privilege. *See City of College Park v. Cotter,* 309 Md. 573, 591, 525 A.2d 1059, 1067 (1987). Nonetheless, express and implied waivers of the privilege are universally recognized limitations on client power to hold the privilege. *See Harrison,* 276 Md. at 137–38, 345 A.2d at 839–40. Wigmore has explained the premise of implied waiver as follows:

> There is always also the objective consideration that when his [the client's] conduct touches a certain point of disclosure, fairness requires that his privileges shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.

*Fraidin v. Weitzman*, 93 Md.App. 168, 228, 611 A.2d 1046, 1076 (1992)(citing 8 Wigmore, Evidence § 2327, at 636). In contrasting express waiver to implied waiver of the privilege, we have cautioned that:

> [s]ince a voluntary disclosure deprives a subsequent claim of privilege based upon confidentiality, and since traditionally waiver is described as the intentional relinquishment of a known right, in determining waiver by implication "regard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and consistency."

*Harrison*, 276 Md. at 138, 345 A.2d at 840 (citations omitted). *See also Wender v. United Serv. Auto. Ass'n*, 434 A.2d 1372, 1374 (D.C.1981)(courts must consider fairness in assessing the issue of implied waiver).

 Maryland recognizes that the attorney-client privilege and other professional-client privileges are waived in any proceeding where the client challenges its hired professional's activity or advice. *See Sears, Roebuck & Co. v. Gussin*, 350 Md. 552, 565, 714 A.2d 188, 194 (1998)(accountant-client privilege is waived "when the client injects the professional activity or the advice of an accountant as an issue in a particular case"); *State v. Thomas*, 325 Md. 160, 174, 599 A.2d 1171, 1177–78 (1992) (attorney-client privilege "is waived by the client in any proceeding where he or she asserts a claim against counsel of ineffective assistance and those communications, and the opinions based upon them are relevant to the determination of the quality of counsel's performance"); *Fraidin*, 93 Md.App. at 229, 611 A.2d at 1076 (where client sues former counsel, former counsel is entitled to reveal privileged information provided it is necessary to the defense

of the client's charge). *Cf.* RPC 1.6 and Comment ("[i]f the lawyer is charged with wrongdoing in which client's conduct is implicated, the rule of confidentiality should not prevent the lawyer from defending against the charge" but the "lawyer must make every effort practicable to avoid unnecessary disclosure of information relating to a representation").

These waiver rules are based, in part, on the premise that the client cannot use the advice of a professional as sword to prove the client's case against former counsel while at the same time asserting the privilege as a shield to prevent disclosing harmful information. *See ST Sys. Corp. v. Maryland Nat. Bank,* 112 Md.App. 20, 36, 684 A.2d 32, 35 (1996). *Accord GAB Business Services, Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11 th Cir.1987)(privilege is a shield and not a sword). It has been said that "a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the defendant." *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of New Hampshire,* 838 F.2d 13, 20 (1 st Cir.1988). To this end, "[a]s hallowed as the attorney-client privilege is, it does not lightly tolerate abuse." *Peterson v. Wallace Computer Serv., Inc.,* 984 F.Supp. 821, 824 (D.Vt.1997). *Accord Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993, 1000 (1933)("The privilege takes flight if the relation is abused").

The question in this case is whether we should extend the implied waiver rule more broadly to attorney-client privileged communications between the client and successor counsel when the client, by claiming malpractice or negligence against former counsel, has injected an issue that also implicates successor counsel's negligence in the same matter.

## C.

As has been argued by the parties, the courts of our sister states are split on the issue of whether contribution claims may be asserted against negligent, successor attorneys. Illinois, Massachusetts, New York, Washington, and Wisconsin

recognize such actions, under certain circumstances, while California, the District of Columbia, Minnesota, New Jersey, Pennsylvania, and Utah seemingly do not.

Appellants cite to cases from California, the District of Columbia, Minnesota, New Jersey, Pennsylvania, and Utah to support the proposition that public policy prohibits former counsel from asserting a third party claim of contribution or indemnification against successor counsel. *See Holland v. Thacher,* 199 Cal.App.3d 924, 245 Cal.Rptr. 247 (1st 1988); *Goldfisher v. Superior Court,* 133 Cal.App.3d 12, 183 Cal.Rptr. 609 (2d 1982); *Gibson, Dunn, & Crutcher v. Superior Court of Los Angeles County,* 94 Cal.App.3d 347, 156 Cal.Rptr. 326 (2d 1979); *Waldman v. Levine,* 544 A.2d 683 (D.C.1988); *Melrose Floor Co., Inc. v. Lechner,* 435 N.W.2d 90, 91–92 (Minn.Ct. App.1989); *Olds v. Donnelly,* 150 N.J. 424, 696 A.2d 633, 643 (1997); *Mentzer & Rhey, Inc. v. Ferrari,* 367 Pa.Super. 123, 532 A.2d 484, 486–87 (1987); *Hughes v. Housley,* 599 P.2d 1250, 1253–54 (Utah 1979). *But see Angelos v. Lloyd,* 106 F.3d 442 (D.C.Cir.1996)(unpublished disposition); *Parker v. Morton,* 117 Cal.App.3d 751, 173 Cal.Rptr. 197 (4th 1981). These courts refuse to recognize a direct action in negligence [8] or third party action in contribution or indemnification for fear of the adverse impact such an action would have on the attorney-client relationship. A myriad of concerns have been

---

**8.** In addition to public policy considerations, some of these courts decided that because no duty was owed or no privity existed between former counsel and successor counsel, former counsel could not maintain an action against successor counsel. *See e.g., Olds,* 696 A.2d at 643–44 (no reinstatement of third-party complaint dismissed by trial court because successor attorney owed no duty of care to predecessor attorney); *Housley,* 599 P.2d at 1253 (former attorney not entitled to relief from successor attorney because no duty was owed to former attorney); *Mentzer & Rhey, Inc.,* 532 A.2d at 486–87 (no cause of action by former attorney against successor attorney because absent privity, successor attorney could not be held liable to anyone except the client). Appellants, however, do not cite to these cases for this proposition. As discussed *supra,* UCATA does not require the existence of a duty owed or privity between the two joint tortfeasors, rather the duty of care is owed to the plaintiff in common liability. Furthermore, we are not presented with the issue of whether a duty of care exists between former counsel and successor counsel.

voiced by these courts. Some feared that the duty of loyalty would be split between client and former counsel if the duty of care was owed to each, *see Gibson, Dunn & Crutcher,* 156 Cal.Rptr. at 330–31; *Olds,* 696 A.2d at 643; *Housley,* 599 P.2d at 1254, or that successor counsel might feel compelled to act in its self-interest, rather than the client's interest, in order to avoid a third party action, *see Holland,* 245 Cal.Rptr. at 251–52; *Waldman,* 544 A.2d at 693. The *Holland* court noted as well that successor counsel might be discouraged from taking a case where it might be sued or, after the taking the case, may feel it necessary to no longer participate in the client's litigation. *See* 245 Cal.Rptr. at 250–51. The result would be that the client is deprived of the attorney of choice or may be left with great difficulty in finding a competent replacement. *See id.* Foreseeing all of these problems, the *Holland* court warned that a third party complaint by former counsel would be used as an ill-motivated tactical device to confuse, disorient, and spread chaos in the opponent's camp. *See* 245 Cal.Rptr. at 250–51.

On the other side of the coin, two appellate Illinois courts have allowed a former attorney to implead a successor attorney when the client only sues the former attorney but both attorneys contributed to the client's injury. In *Goran v. Glieberman,* 276 Ill.App.3d 590, 213 Ill.Dec. 426, 659 N.E.2d 56, 61 (1 st 1995), the court explained that under Illinois law "an attorney may seek contribution from a subsequent attorney where both attorneys worked on the same underlying cause." (discussing *Faier v. Ambrose & Cushing, P.C.,* 154 Ill.2d 384, 182 Ill.Dec. 12, 609 N.E.2d 315 (1993)). The court rejected the contention that continued representation of the client was not grounds to dismiss former counsel's suit against the successor attorney. Under this premise, said the court, "substitute counsel, no matter how egregious their conduct, would be immunized from suit simply because the client whom they continue to represent chooses not to sue her current counsel." *Goran,* 213 Ill.Dec. 426, 659 N.E.2d at 61. *Accord Brown–Seydel v. Mehta,* 281 Ill.App.3d 365, 217 Ill.Dec. 131,

666 N.E.2d 800, 802 (6th 1996)(citing *Goran* ), *appeal denied,* 168 Ill.2d 583, 219 Ill.Dec. 560, 671 N.E.2d 727 (1996).

The Supreme Judicial Court of Massachusetts has reached a similar conclusion. In *Maddocks v. Ricker,* the Court held:

> An issue that could be independent of the underlying controversy is the question whether the defendant attorneys have any valid claim against Casson [as a third-party successor attorney]. The plaintiffs [as clients] are probably correct that Casson could not be directly liable to the defendant attorneys [as former attorneys for the client] for his negligence in handling the plaintiffs' claims against Gove. That fact is irrelevant, however, because, as we read the third-party complaint, the defendant attorneys' claim against Casson is founded on Casson's obligation of contribution if it is determined that the plaintiffs lost their claims against Gove because both the defendants and Casson were negligent. Further, in considering another issue collateral to the underlying dispute, we see no valid basis for argument that, as a matter of law on the face of the pleadings, the alleged negligence of the defendants and of Casson did not result in joint liability for the same injury to the plaintiffs, thus justifying contribution.

> When Lawyer II brings an action for malpractice on behalf of a client against Lawyer I, Lawyer II is not immunized from liability to Lawyer I for contribution if the negligence of each caused the same injury to the client.

403 Mass. 592, 531 N.E.2d 583, 589 (1988) (citations omitted). Nonetheless, in allowing former counsel to implead client-plaintiff's current counsel for contribution, the Court expressed concerns that the attorney-client privilege and legal ethical considerations were at risk in such actions and that practical judicial measures must be taken to balance the contribution right against the attorney-client privilege. The Court cautioned:

> A decision to add a plaintiff's lawyer as a third-party defendant has significant consequences to the client because the client must lose the attorney of his choice or must await

a decision as to whether his current attorney (Lawyer II) might be liable for contribution. The decision . . . to allow a third-party complaint (or the decision not to dismiss such a complaint filed of right . . . ) requires careful and prompt judicial attention. If the merits of the claim for contribution can be addressed and ruled on immediately, the question whether a plaintiff needs new counsel should be answered at an early stage in the case. The judge should be alert to the possibility that Lawyer I is using the cross-complaint as a tactical device to disqualify Lawyer II. At the same time, Lawyer II should not be entitled to use his continued representation of the client to immunize himself from the consequences of his own negligent conduct.

We conclude, on the issues open for consideration in this appeal, that Casson may not properly represent the plaintiffs and at the same time be a third-party defendant.

*Maddocks,* 531 N.E.2d at 589.

In *Schauer v. Joyce,* the Court of Appeals of New York allowed a former attorney to seek contribution against the attorney who replaced him for negligence causing the claimed injury upon the plaintiff-client. *See* 54 N.Y.2d 1, 444 N.Y.S.2d 564, 429 N.E.2d 83, 85 (1981). The Court rejected the successor attorney's argument that there was no contractual privity or duties between former and successor attorneys in the case and, therefore, it owned no contribution to the defendant. The Court held that existence of a duty between the wrongdoer attorneys was not a necessary predicate for the former attorney to sue the successor. *See Schauer,* 444 N.Y.S.2d 564, 429 N.E.2d at 84. *See also Rosner v. Paley,* 65 N.Y.2d 736, 492 N.Y.S.2d 13, 481 N.E.2d 553, 555 (1985)(citing *Schauer* ); *Hansen v. Brognano,* 137 A.D.2d 880, 881, 524 N.Y.S.2d 862 (1988)(citing *Schauer* and explaining that "[a]n attorney sued for malpractice is entitled to commence a third-party claim for contribution against a subsequent attorney whose negligence has contributed to or aggravated the plaintiff's damages" and "[t]his same principle applies where, as here, a claim for indemnification is asserted"); *Catania v. Lippman,* 98 A.D.2d 826, 827, 470 N.Y.S.2d 487 (1983)(citing *Schauer* and conclud-

ing that third party attorneys should be disqualified from representing client).

The Court of Appeals of Wisconsin has allowed impleader suits against successor attorneys and has rejected an attorney-client privilege public policy exception. In *Brown v. LaChance,* the court explained:

we [have] held that privity is not required between two attorneys where one is seeking recovery from the other on alternative theories of contribution or indemnity in an action against one attorney by a mutual client. . . . [H]ere we are concerned with more than one attorney's alleged negligence to the same client. Thus, the policy protecting an attorney's zealous representation of a client is not defeated by allowing a claim for contribution or indemnity by one attorney against another for alleged negligence in the representation of the same client. Instead, allowing such claims promotes that policy by assuring that any attorney who negligently represents a client may be held liable. To allow a client to sue one attorney where two or more attorneys may be responsible for the client's damages, and not allow contribution among all negligent attorneys, defeats the purpose of contribution among joint tortfeasors—assuring that the responsible parties pay their share of damages.

Furthermore, although the Minnesota cases are not controlling, there is a legitimate concern with protecting attorney-client confidentiality. By suing attorney "A," the client waives his or her right to confidentiality. However, this waiver does not apply to the client's attorney "B" who is joined by "A" for purposes of contribution. This joinder may present evidentiary problems for attorney "A" at trial, but it does not defeat his right to sue for contribution or indemnity. Therefore, we hold that the absence of privity between [successor attorney] . . . and Smith [former attorney] does not defeat their action for contribution or indemnity against Rudnick..

165 Wis.2d 52, 477 N.W.2d 296, 301–02 (App.1991), *review denied,* 479 N.W.2d 173 (Wis.1991)(citations omitted).

In *Pappas v. Holloway,* 114 Wash.2d 198, 787 P.2d 30, 36–37 (1990), the Supreme Court of Washington held that, under certain conditions, a former attorney sued by the client may implead successor counsel and pierce the attorney-client privilege. In *Pappas,* the former attorney sued his client for unpaid attorney's fees in a particular case. *See id.* at 32–33. The client counter-claimed malpractice against the former attorney relating to the same matter. *See id.* The client had been represented by several different counsel throughout the litigation, however, and former counsel sought to implead the attorneys who had represented the client in an effort to show that he was not responsible, or only partially responsible, for the client's loss. *See id.* at 33.

The Court in *Pappas* balanced the interests of the client's attorney-client privilege against the interests of former counsel in mounting an adequate defense to the claim of malpractice. It explained that the attorney-client privilege was not absolute and was subject to exceptions such as when an attorney is sued for malpractice. *See id.* at 34. "Where it would be manifest injustice to allow the client to take advantage of the rule of privileges to the prejudice of the attorney, or when it would be carried to the extent of depriving the attorney of the means of obtaining or defending his own rights, this court has ruled the privilege is waived." *Id.* The Court went on to extend the implied waiver rule as it applies to third-party defendants, but qualified the waiver to apply only if certain circumstances were met. It explained:

In *Hearn v. Rhay,* 68 F.R.D. 574 (D.C.Wash.1975), the United States District Court for Eastern Washington developed a test to determine whether the facts in a given case support an implied waiver of the attorney-client privilege. The plaintiff in *Hearn,* an inmate at the Washington State Penitentiary in Walla Walla, sued State prison officials in their official capacity for alleged civil rights violations. *Hearn,* at 576–77. The defendants raised the affirmative defense of qualified immunity from suit on the grounds they acted in good faith and on advice of their legal counsel. *Hearn,* at 577. When plaintiff requested disclosure of com-

munications between defendants and their attorneys, defendants refused to comply on the grounds the communications were protected under the attorney-client privilege. *Hearn,* at 577. Plaintiff argued the attorney-client privilege did not cover the communications, or, in the alternative, that defendants waived the privilege by asserting their good faith affirmative defense. *Hearn,* at 580. In holding defendants were required to disclose the communications, the trial court concluded that where the following three conditions are satisfied, an implied waiver of the attorney-client privilege should be found: (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. *Hearn,* at 581.

\* \* \* \* \*

... In this instance, the [clients] cannot counterclaim against [former counsel] for malpractice and at the same time conceal from him communications which have a direct bearing on this issue simply because the attorney-client privilege protects them. To do so would in effect enable them to use as a sword the protection which the Legislature awarded them as a shield.

Applying *Hearn* to the present case, we find the record supports an implied waiver of the attorney-client privilege as to all the attorneys who were involved in defending the [clients] in the underlying litigation. First, the [clients] counterclaimed against [former counsel] for malpractice. This affirmative act was the catalyst which caused [former counsel] to file his third-party complaints against the other attorneys involved. Second, the [clients'] counterclaim itself caused malpractice to become an issue in this litigation. [Former counsel's] claims against third-party defendants are virtually identical to the claims made against him by the [clients]; hence, his third-party complaints add nothing new to the issue of malpractice. . . .

Finally, to allow the [clients] to block [former counsel's] request for communications relating to the ... litigation would effectively deny him an adequate defense. In order for the [clients] to prove [former counsel] committed malpractice, they will have to show, among other things, that [former counsel] had a duty to exercise the care and skill of a reasonably prudent attorney and that [former counsel] failed to meet this duty. Contrary to the [clients'] claim that the only information relevant to this issue is what actually happened, this inquiry will involve examining decisions made at various stages of the underlying litigation. This will necessarily involve information communicated between these attorneys and the [clients]. This is particularly true given that [former counsel] was not the attorney who actually tried the case, nor did he have any part in its eventual settlement. . . .

*Id.* at 36–37 (some citations omitted). *Accord Rutgard v. Haynes*, 185 F.R.D. 596, 599–600 (S.D.Cal.1999)(citing the reasoning of *Pappas* with approval); *Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 635–37 (D.Kan.2000)(adopting and applying *Pappas* ).

### D.

The holdings of our sister states that allow a former attorney to implead an assertedly negligent successor attorney for contribution or indemnification are more closely aligned with our view of Maryland law than our sisters states that do not. While we too are concerned with protecting the attorney-client privilege and the attorney-client relationship, this Court is reluctant to exempt a potential joint tortfeasor from accepting the blame for its negligent actions.

We are aware that Maryland has created exceptions to UCATA, in an immunity context, for certain third parties despite that party's culpable conduct. *See Hatzinicolas v. Protopapas*, 314 Md. 340, 353, 550 A.2d 947, 954 (1988)(discussing immunities granted over the years such as interspousal immunity, workers' compensation immunity, and parent-

child immunity). Under such circumstances, when immunity is recognized, no right to contribution or indemnification exists because the third party has no common liability to the plaintiff. *See Hatzinicolas,* 314 Md. at 353, 550 A.2d at 954. "Contribution is not available where an immunity exists between the third party and the original plaintiff, because the immune party cannot be held liable to the plaintiff." *See* 1 Lee Lindahl, Modern Tort Law: Liability and Litigation § 20.20, at 707 (1994). It has been further noted that:

> Instances are not uncommon when one of the tortfeasors has at the time of the tort a personal defense against the injured person that negates the possibility of personal legal liability and thus makes common liability a logical impossibility. In that situation it has been the traditional view that the person compelled to discharge the liability cannot recover contribution from the other, whose participation in the tort gave the injured party no cause of action against him.

3 Fowler V. Harper, et al., The Law of Torts § 10.2, at 47–50 (1986, 1998 Supp.). Like the attorney-client privilege, the immunities previously recognized as applying to UCATA actions were grounded on public policy concerns. For example, in *Hatzinicolas,* we noted that the parent-child immunity "is founded upon public policy, and is designed to preserve peace and harmony of the home, as well as to recognize the authority of the parent, under normal conditions, responsible for the maintenance of the home." 314 Md. at 356, 550 A.2d at 955 (citing *Frye v. Frye,* 305 Md. 542, 550, 505 A.2d 826, 830 (1986))(other citations and internal quotations omitted). The interspousal immunity was based on the premise that to allow suits between spouses would adversely affect familial ties and strike at the heart of domestic relations. *See Boblitz v. Boblitz,* 296 Md. 242, 253–57, 462 A.2d 506, 511–13 (1983)(discussing the rationale behind the immunity and the states that refused to abrogate it).

Nonetheless, the historical underpinnings of UCATA, notably its purpose in remedying the injustices of the common law rule barring joint tortfeasors' actions in negligence, are not easily swept aside or forgotten by this Court. In *Valk Mfg.*

*Co.,* we expressed a reluctance for carving out exceptions from UCATA. *See* 317 Md. at 196, 562 A.2d at 1251. We noted also that immunities are on the wane. *See id.,* 1 Stuart M. Speiser, et al., The American Law of Torts § 3:21, at 458 (1983, 2000 Supp.). *See also Hatzinicolas,* 314 Md. at 353–54, 550 A.2d at 953–54 (refusing to extend the parent-child immunity to defendant). This Court and many of our sister states have either eliminated or chipped away at them by narrowing their application to avoid inequities. *See Boblitz,* 296 Md. at 274–75, 462 A.2d at 522 (abrogating interspousal immunity); *Mahnke v. Moore,* 197 Md. 61, 67–68, 77 A.2d 923, 926 (1951)(narrowing parent-child immunity's application by allowing a minor child to sue parent under cruel and inhuman treatment or malicious and wanton wrong theories); Stuart M. Speiser, et al., The American Law of Torts § 3:22, at 458–59 (1983, 2000 Supp.)(citing to several states that have allowed contribution despite immunities under the theory that "as between the two tortfeasors, the contribution is not a recovery for the tort, but the enforcement of an equitable duty to share liability for the wrong done") (citations omitted). It has been further explained that:

> [i]n a growing number of jurisdictions ... the policies in favor of contribution have been deemed to outweigh those in favor of the immunity of the actors who have a personal defense to the injured person's claim. Thus contribution has in such jurisdictions been permitted against otherwise immune spouses and other relatives, as well as employers who would not be liable in tort to an injured employee because of the exclusive remedy provision of the applicable workers' compensation act. If the purpose of contribution is to make the wrongdoers share the financial burden of their wrong, then the primary element of contribution should be the participation of the wrongdoers in acts or omissions that are considered tortious and that result in injury to a third person. The fact that one of the tortfeasors has a personal defense if he were to be sued by the injured party would seem to be irrelevant.

3 Fowler V. Harper, et al., The Law of Torts § 10.2, at 47–50 (1986, 1998 Supp.). "And just as courts have become increasingly reluctant to bar a plaintiff's cause of action, so are they reluctant to bar contribution among unintentional wrongdoers." *Valk Mfg. Co.*, 317 Md. at 196, 562 A.2d at 1251.

Importantly, this Court also has held that attorneys who act negligently in settlement proceedings should be held accountable to the client for their actions. *See Thomas v. Bethea*, 351 Md. 513, 528–30, 718 A.2d 1187, 1194–96 (1998). *Thomas* acknowledged that settlement proceedings are an integral part of a litigating attorney's representation and that most cases end in settlement without adjudication. *See* 351 Md. at 529, 718 A.2d at 1195. "There can be little doubt that clients routinely anticipate that their cases will be settled and that they rely heavily on their lawyer's recommendation regarding settlement, expecting that the lawyer has a sufficient understanding of the relevant facts, law, and prospects to make an intelligent recommendation." 351 Md. at 529, 718 A.2d at 1195. In imposing the duty of reasonable care in settlement proceedings, *Thomas* reiterated the long-held rule that:

"[E]very client employing an attorney has a right to the exercise, on the part of the attorney, of ordinary care and diligence in the execution of the business intrusted to him, and to a fair average degree of professional skill and knowledge; and if the attorney has not as much of these qualities as he ought to possess, and which, by holding himself out for employment he impliedly represents himself as possessing, or if, having them, he has neglected to employ them, the law makes him responsible for the loss or damage which has accrued to his client from their deficiency or failure of application."

351 Md. at 530, 718 A.2d at 1195 (citing *Cochrane v. Little*, 71 Md. 323, 332, 18 A. 698, 701 (1889)).

Prohibiting a joint tortfeasor action in this case would open an undesirable loophole in *Thomas* and circumvent UCATA's purpose. A central premise of *Thomas* and UCATA is that a party should be held accountable for damages caused by his or her negligence. Successor counsel could escape from this

accountability by forcing former counsel to shoulder the burden of loss to the client in situations where both attorneys may have brought about the client's injury. The unfair and unjust outcome for former counsel would be reminiscent of the pre-UCATA era. We think the better public policy approach is for the parties to lay their cards on the table for the fact-finder to determine the facts and allocate the loss to the proper parties, rather than granting successor counsel a shield of immunity for its alleged wrongful acts.

We respect the public policy concerns voiced by our sister states that prohibit former counsel from suing successor counsel. Many of their concerns, however, cut both ways. Prohibiting an impleader action in such cases also may undermine the attorney-client relationship. For example, the *Holland* court voiced concern that allowing former counsel to sue successor counsel would forge an irresponsible weapon of intimidation. *See* 245 Cal.Rptr. at 250. By the same token, we can envision, given successor counsel's position of trust with and influence over the client, that a bar to an impleader action could create a situation ripe for successor attorney mischief and manipulation. It would hardly be in the client's best interest to be represented by counsel that was negligent in causing an injury to the client, but who failed to disclose the negligence to the client or take responsibility for the action. This dominant position leaves us uneasy accepting the notion that successor counsel should be left to its potential self-dealing.[9] Furthermore, Appellants' argument that their ethical duty of confidentiality is infringed by the tortfeasor action is misplaced. As discussed *supra,* the confidentiality duty, unless exempted by law, must succumb to discovery and the search for truth.

Moreover, we do not lack faith in the disciplinary tools in the Maryland Rules, and particularly the Rules of Professional Conduct (RPC), that deter the filing of frivolous

---

9. We do not intend, by noting the potential for these adverse conditions, to imply any view that such conditions exist with regard to Parler in the present case.

and harassing claims. They represent potential consequences to discourage an improper impleader action. They address, for example, the *Holland* court's concerns, such as the availability for monetary sanctions, at the state and federal[10] levels, against attorneys that fall prey to the temptation of harassing an opponent. Maryland Rule 1–341 states:

Rule 1–341. Bad faith—Unjustified proceeding.

In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

"Rule 1–341 sanctions are judicially guided missiles pointed at those who proceed in the courts without any colorable right to do so." *Legal Aid Bureau, Inc. v. Bishop's Garth Assoc. Ltd. Partnership*, 75 Md.App. 214, 224, 540 A.2d 1175, 1180 (1988). Furthermore, violation of RPC 3.1,[11] which prohibits the filing of frivolous suits, is grounds for attorney discipline and can lead to disbarment. *See Attorney Grievance Comm'n of Maryland v. Brown*, 353 Md. 271, 283–85, 725 A.2d 1069, 1074–75 (1999); *Attorney Grievance Comm'n v. Alison*, 349 Md. 623, 635, 709 A.2d 1212, 1217–18 (1998).

 Sharing Parler's concern for protecting the attorney-client privilege, we reject Miles' assertion that the attorney-client privilege is waived automatically between the client

---

**10.** *See* Rule 11 of the Federal Rules of Civil Procedure which prohibits cases filed to harass (*see* Rule 11(b)) and allows the federal courts to impose sanctions for violations of the rule (*see* Rule 11(c)).

**11.** Rule 3.1. Meritorious claims and contentions.

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

and successor counsel simply by the client suing former counsel. Because the concepts and reasoning behind the three prongs in the *Hearn* Test, as discussed in *Pappas*, are well-established in Maryland, we think the *Hearn* Test[12] serves as an appropriate tool in balancing Miles' statutory right to contribution under UCATA and Parler's concern in protecting the attorney-client privilege.

 The burden of showing waiver of the privilege rests with Miles. *See Sears, Roebuck & Co.*, 350 Md. at 567, 714

---

**12.** The *Hearn* Test and its underlying reasoning have been applied or cited with approval by numerous federal and state jurisdictions in determining an implied waiver under various settings. *See United States v. Amlani*, 169 F.3d 1189, 1195 (9 th Cir.1999); *Bilzerian*, 926 F.2d at 1292; *Conkling v. Turner*, 883 F.2d 431, 434 (5 th Cir.1989); *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7 th Cir.1987); *GAB Business Services, Inc.*, 809 F.2d at 762, n. 11; *Sedco Int'l v. Cory*, 683 F.2d 1201, 1206 (8 th Cir.1982); *Simmons Foods, Inc.*, 191 F.R.D. at 635–36; *Rutgard*, 185 F.R.D. at 599–600; *Walsh v. Seaboard Sur. Co.*, 184 F.R.D. 494, 496 (D.Conn.1999); *Peterson v. Wallace Computer Serv., Inc.*, 984 F.Supp. 821, 824–25 (D.Vt.1997); *In re Kidder Peabody Securities Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y.1996); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 488 (S.D.N.Y.1993); *Federal Deposit Ins. Corp. v. Wise*, 139 F.R.D. 168, 171 (D.Colo.1991); *Federal Deposit Ins. Corp. v. United States*, 527 F.Supp. 942, 950 (S.D.W.Va.1981); *Pitney–Bowes, Inc.*, 86 F.R.D. at 447; *Southern California Gas Co. v. Public Utilities Comm'n*, 50 Cal.3d 31, 265 Cal.Rptr. 801, 784 P.2d 1373, 1378–79 (1990); *Mountain States Tel. and Tel. Co. v. DiFede*, 780 P.2d 533, 543–44 (Colo.1989); *State Farm Mut. Auto. Ins. Co. v. Lee*, —— Ariz. ——, 4 P.3d 402, 408–09 (Ct.App.2000)(slip copy); *Frank W. Schaefer, Inc. v. C. Garfield Mitchell Agency, Inc.*, 82 Ohio App.3d 322, 612 N.E.2d 442, 447–48 (1992); *Bryan v. State*, 848 S.W.2d 72, 81 (Tenn.Crim.App.1992); *Home Ins. Co. v. Advance Mach. Co.*, 443 So.2d 165, 168 (Fla.Dist.Ct.App.1983); *Wender v. United Serv. Auto. Assoc.*, 434 A.2d 1372, 1374 (D.C.App.1981).

Courts that have not adopted the *Hearn* Test per se have nonetheless adopted similar implied waiver tests, under the rationale that their tests are supposedly more stringent in protecting the attorney-client privilege. *See Aranson v. Schroeder*, 140 N.H. 359, 671 A.2d 1023, 1030 (1995); *Succession of Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138, 1145–46 (La.1987); *Mortgage Guarantee & Title Co. v. Cunha*, 745 A.2d 156, 159–60 (R.I.2000); *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex.1993)(calling implied waiver test "offensive use waiver"). *But see Howe v. Detroit Free Press, Inc.*, 440 Mich. 203, 487 N.W.2d 374, 382 (1992)(declining to adopt *Hearn* based on the facts of the case before it but adopting a similar standard); *Rhone–Poulenc Rorer Inc. v.*

A.2d at 195. Once the first prong of the *Hearn* Test is met by the client filing suit or asserting a claim against former counsel, the second prong of the *Hearn* Test is met by the client injecting a crucial issue relevant to disposition of the suit. *See Mountain States Tel. and Tel. Co.*, 780 P.2d at 544; *League v. Vanice*, 221 Neb. 34, 374 N.W.2d 849, 856 (1985). As discussed *supra*, Maryland recognizes issue injection as a valid precursor to waiving client-held, confidential communication privileges. *See Sears, Roebuck & Co.*, 350 Md. at 565, 714 A.2d at 194 (implied waiver in accountant-client privilege context); *Thomas*, 325 Md. at 174, 599 A.2d at 1177–78 (implied waiver when client challenge's attorney's effectiveness in counsel); *Fraidin*, 93 Md.App. at 229, 611 A.2d at 1076 ("[u]nder the self-defense exception, counsel is permitted to reveal client confidence to the extent necessary to defend counsel from charges of wrongdoing"). *See also Southern California Gas Co.*, 265 Cal.Rptr. 801, 784 P.2d at 1380 (calling it "deliberate injection" of the issue); *Lorenz*, 815 F.2d at 1098 ("holder must inject a new factual or legal issue into the case").

Under the third prong (vitality), the privileged information must be necessary to defend against an essential element of the claim. *See Hearn*, 68 F.R.D. at 581; *Goldsmith v. State*, 337 Md. 112, 134–35, 651 A.2d 866, 877 (1995)(the information sought must be necessary for a proper defense to pierce the psychotherapist-patient privilege); *Fraidin*, 93 Md.App. at 229, 611 A.2d at 1076 (waiver must be narrowly construed and should be "limited strictly to information necessary to the attorney's defense"). Mere relevance or helpfulness of the information sought is not enough to pierce a professional-client privilege. *See Sears, Roebuck & Co.*, 350 Md. at 567, 714 A.2d at 195 (accountant-client privilege); *Goldsmith*, 337 Md. at 133, 651 A.2d at 876 (psychotherapist-patient privilege). *Accord Frontier Refining, Inc. v. Gorman–Rupp Co., Inc.*, 136 F.3d 695, 699 (10 th Cir.1998)(explain-

---

*Home Indemn. Co.*, 32 F.3d 851, 864 (3 rd Cir.1994)(citing to the *Hearn* Test as dubious in validity).

ing that mere relevance does not meet the *Hearn* vitality prong). In other words, "[w]hen the sought-after evidence is only one of several forms of indirect evidence about an issue, the privilege has not been waived." *Amlani,* 169 F.3d at 1195 (citations and internal quotations omitted). This implies that the privileged information sought must be available from no other source. *See Frontier Refining, Inc.,* 136 F.3d at 699. *Hearn* explains further:

> In an ordinary case the obstruction [to investigating the truth] is not likely to be great, for attorney-client communications are usually incidental to the lawsuit, notwithstanding their possible relevance, and other means of proof are normally available. In this case, however, the content of defendant's [sic] communications with their attorney is inextricably merged with the elements of plaintiff's case and defendants' affirmative defense. These communications are not incidental to the case; they inhere in the controversy itself, and to deny access to them would preclude the court from a fair and just determination of the issues. To allow assertion of the privilege in this manner would pervert its essential purpose and transform it into a potential tool for concealment ... behind a veil of confidentiality. Under these circumstances, the benefit to be gained from disclosure far outweighs the resulting injury to the attorney-client relationship. The privilege should not apply.

68 F.R.D. at 582. *Accord Greater Newburyport Clamshell Alliance,* 838 F.2d at 20 ("the privilege ends at the point where the defendant can show that the plaintiff's civil claim, and the probable defenses thereto, are enmeshed in important evidence that will unavailable to the defendant if the privilege prevails").

## II.

The remaining question is whether former counsel may sue successor counsel, via impleader, under the theory that successor counsel was negligent in settlement proceedings that may have ultimately contributed to the client's

damages for which former counsel has been sued. We hold such a suit is cognizable in Maryland.

As discussed *supra,* UCATA defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." CJP § 3–1401(c). This definition requires the defendant impleading a third party to allege that the third party was directly liable to the plaintiff and somehow is jointly liable with the defendant for the same injury to the plaintiff.

Attorney negligence in settlement proceedings is proven the same as any other negligence. *See Thomas,* 351 Md. at 529, 718 A.2d at 1195 (rejecting a heightened standard of negligence for attorneys). Here, in a contribution action, Miles would need to prove Parler's neglect of a reasonable duty owed to Royal's insured, that breach of the duty proximately caused injury to Royal's insured, and that Parler's negligence contributed, with Miles' negligence, to causing the same injury, wholly or in part, to Royal's insured. *See Thomas,* 351 Md. at 528–29, 718 A.2d at 1195; *Flaherty v. Weinberg,* 303 Md. 116, 128, 492 A.2d 618, 624 (1985).

We reiterate here that which was stated in *Thomas,* that "lawyers [should] not be regarded as negligent simply because another lawyer, or even most lawyers, with the benefit of hindsight, would not have made the recommendation at issue." 351 Md. at 529, 718 A.2d at 1195. The reason is that "the factors that the lawyer must consider in developing a settlement recommendation, as well as the recommendation itself, 'are mostly subjective in nature,' and that there can legitimately exist 'a range for honest differences of opinion in making settlement recommendations.'" *Id.* (citations omitted). Mere disagreement between lawyers regarding how to settle a case is common and a difference in opinion cannot be grounds for negligence. When the duty to exercise reasonable care in settlement proceedings is challenged, the alleged negligence must be determined in light of traditional professional negligence standards. *See id.*

CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS IN THIS COURT TO BE EQUALLY DIVIDED BY THE PARTIES.