*Gables Construction, Inc. v. Red Coats, Inc., et al.*, No. 23, September Term, 2019, Opinion by Booth, J.

**RIGHT OF CONTRIBUTION; JOINT TORT-FEASOR LIABILITY**—For a statutory claim of contribution under the Maryland Uniform Contribution Among Joint Tort-Feasors Act ("UCATA"), Md. Code (1974, 2013 Repl. Vol., 2019 Cum. Supp.), Courts and Judicial Proceedings Article ("CJ") § 3-1401, *et. seq.* parties must be joint tortfeasors. Under our decades of jurisprudence interpreting the UCATA, a joint tortfeasor must be "liable in tort" to the injured party. "Liable in tort" requires legal responsibility and common liability, not mere culpability to the injured party for a wrong. We have repeatedly held that there is no right of contribution where the injured person has no right of action against the third-party defendant. The statutory right to contribution is not an independent cause of action, but is a derivative right arising out of common liability to the injured party. We decline to carve out an exception from the plain language of the UCATA by treating the contractual defense of waiver of subrogation differently from other defenses such as immunities and contributory negligence.

Circuit Court for Montgomery County
Case No.: 397964-V
Argued: November 4, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2019

GABLES CONSTRUCTION, INC.

v.

RED COATS, INC., et al.

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Greene, Clayton, Jr. (Senior Judge,
  Specially Assigned),

JJ.

Opinion by Booth, J.

Filed: May 26, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Under our American civil justice system, there are situations in which a wrongdoer may be culpable for causing an injury, but not legally responsible to the injured party for damages. These scenarios can arise through the application of a variety of legal defenses which preclude recovery by the injured person, such as a statutory defense arising from an immunity, or a common law bar such as contributory negligence or assumption of the risk. There are also situations where the joint actions of two or more wrongdoers make these individuals jointly and severally liable for causing injuries to an injured party. In certain instances, where one wrongdoer has paid damages and has discharged the injured party's claim, the wrongdoer may have the right to recover a pro rata share of damages from another legally responsible party. Such a claim is known as a right to contribution, which arises under the Maryland Uniform Contribution Among Joint Tort-Feasors Act, Md. Code (1974, 2013 Repl. Vol., 2019 Cum. Supp.), Courts & Judicial Proceedings Art. ("CJ") § 3-1401, *et. seq.* ("UCATA"). The UCATA provides for the right of contribution among "joint tort-feasors," which is defined as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." CJ §§ 3-1401(c); 3-1402. In this case, we must determine whether a claim for contribution may arise under the UCATA when two wrongdoers are *culpable* for the wrong inflicted on the injured party, but only one wrongdoer is *legally responsible* to the injured party because of a defense arising from a contractual waiver of subrogation.

During the evening of March 31, 2014, and early morning of April 1, 2014, a fire damaged a near-completed 139-unit apartment building. The fire caused approximately

$22,150,000 in damage. The project's owner, Upper Rock II, LLC ("Upper Rock"), brought suit against Red Coats, Inc. ("Red Coats"), a firm hired to perform security and fire watch, alleging gross negligence and breach of contract. Red Coats filed a third-party claim against Gables Construction, Inc. ("GCI"), the project's general contractor, as well as other parties, seeking contribution under the UCATA.

Prior to construction, Upper Rock and GCI entered into a contract ("the Prime Contract"), which included a waiver of subrogation, which required Upper Rock to purchase property insurance and transfer all risk of loss for fire-related claims to the insurer, rather than Upper Rock and GCI. Under the waiver provisions, the parties waived the right to recover damages from fire-related claims from each other or any of their subcontractors, sub-subcontractors, and employees. As a result of the waiver of subrogation, Upper Rock could not hold GCI liable for any damages from the fire.

After Upper Rock and Red Coats settled, GCI moved for summary judgment. GCI argued that, because it was not liable to Upper Rock, GCI did not fit the definition of joint tortfeasor under the UCATA and, therefore, Red Coats' action for contribution must fail as a matter of law. The circuit court denied GCI's motion, and the case proceeded to trial. After hearing testimony from various witnesses, the jury found that the fire was a direct and foreseeable consequence of GCI's negligence and that Red Coats was entitled to contribution from GCI in the amount of $7 million.

GCI appealed, and the Court of Special Appeals affirmed Red Coats' ability to recover contribution, but reduced the amount to $2 million, half of what Red Coats paid out of pocket in its settlement with Upper Rock. GCI petitioned for a writ of *certiorari*,

2

which we granted to consider the following question: "As a matter of first impression, did [the Court of Special Appeals] err in holding that a defendant can be liable for joint tortfeasor contribution even though it is not liable to the injured person in tort by virtue of a contractual waiver of claims covered by insurance?"

For reasons set forth below, we hold that where a waiver of subrogation precludes liability to the injured party, the third-party defendant does not fall within the definition of a "joint tortfeasor" under the UCATA and there is no statutory right of contribution.

## I. BACKGROUND

Upper Rock and GCI entered into the Prime Contract on August 2, 2012. Under the terms of the Prime Contract, GCI would serve as the general contractor for the construction of a multi-building apartment complex in Rockville, Maryland (the "Project"). The Prime Contract was an American Institute of Architects ("AIA")[1] standard form general contract and consisted of two main documents: (1) AIA Document A102™ – 2007, Standard Form Agreement Between Owner and Contractor (the "A102 Document"); and (2) AIA Document A201™ – 2007, General Conditions of the Contract for Construction (the "General Conditions"). Upper Rock and GCI modified or eliminated certain provisions of these AIA

---

[1] The American Institute of Architects (AIA) is a professional organization founded in 1857, which consists of over 94,000 members. The AIA has been publishing standard form contracts for use within the construction industry since 1888. *The History of AIA Contract Documents*, The American Institute of Architects (2020), https://perma.cc/8LPZ-JS7R. Since 1976, the AIA has revised its contract documents on a uniform ten-year cycle, giving ample time to account for emerging trends in the construction industry and legal field, as well as obtaining feedback and commentary from insurance experts. *Id.* In this case, Upper Rock and GCI utilized the 2007 Edition of the AIA Documents A102 and A201, which they modified.

standard forms.  However, in the General Conditions, they retained language relating to the purchase of property insurance, and they retained the fundamental concepts contained in a related waiver of subrogation, as those provisions had been drafted by the AIA.

Those provisions placed the responsibility on the Owner, Upper Rock, to purchase and maintain a policy of property insurance on the work being performed.  The waiver of subrogation provision, Section 11.3.1, provided that the Owner waive all rights against the Contractor, GCI, as well as other project participants, including subcontractors, for damages caused by fire or other causes of loss to the extent covered by insurance.

Section 11.3.1 provided:

> [T]he Owner [Upper Rock] shall purchase and maintain . . . property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the . . . total value for the entire Project at the site on a replacement cost basis[.] . . . Such property insurance shall be maintained . . . until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner [Upper Rock] has an insurable interest in the property required by this Section 11.3 to be covered, whichever is later.  This insurance shall include interests of the Owner [Upper Rock], the Contractor [GCI], Subcontractors and Sub-subcontractors in the Project.[2]

The General Conditions § 11.3.1.1 provided that the insurance obtained by Upper Rock pursuant to § 11.3 "shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage[.]"  Additionally, if the property

---

[2] Although Upper Rock and GCI modified or eliminated certain provisions in the AIA standard forms, they retained the provisions drafted by the AIA related to the purchase of property insurance and the provisions related to the waiver of subrogation.  Section 11.3.1. is the verbatim provision as drafted by the AIA in its standard documents.

insurance required deductibles, "the Owner [Upper Rock] shall pay costs not covered because of such deductibles as a Cost of the Work." General Conditions, § 11.3.1.3.

Section 11.3.1.2 provided:

> If the Owner [Upper Rock] does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner [Upper Rock] shall so inform the Contractor [GCI] in writing prior to the commencement of the Work. The Contractor [GCI] may then effect insurance that will protect the interests of the Contractor [GCI], Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the costs thereof shall be charged to the Owner [Upper Rock]. If the Contractor [GCI] is damaged by the failure or neglect of the Owner [Upper Rock] to purchase or maintain insurance as described above, without so notifying the Contractor [GCI] in writing, then the Owner [Upper Rock] shall bear all reasonable costs properly attributable thereto.[3]

Section 11.3.7 provided, in pertinent part:

> The Owner [Upper Rock] and Contractor [GCI] waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) any of their subcontractors, sub-subcontractors and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant

_____

[3] This provision is the verbatim provision as drafted by the AIA.

to this Section 11.[3][4] or other property insurance applicable to
the Work[.][5]

Read together, the waiver of subrogation and property insurance provisions transferred the entire risk of loss by fire to the builder's risk insurer, rather than Upper Rock and GCI, and waived all fire-related claims between Upper Rock and GCI.

In January 2014, GCI's parent company, Gables Residential Services, Inc. ("GRSI"), hired Red Coats to perform fire watch and security services for the Project. Typically, GCI's assistant superintendent for the Project would sweep the buildings each day for hazards after the jobsite closed. After that, a Red Coats security officer would provide security for the Project.

During the night of March 31, GCI's superintendent did not perform the typical sweep of the building. After the last worker left and the gates were locked, no one was

---

[4] This section contained a reference to Section 11.4 instead of 11.3. Reading the language of the Prime Contract in its entirety, the section reference is clearly a typographical error. Section 11.4 of the standard AIA contract was omitted from the Prime Contract in its entirety. The phrase in the Contract also refers to "*this* Section 11.4," which is located in Section 11.3 of the Prime Contract. (Emphasis added). As discussed herein, Red Coats never argued at trial or on appeal before the Court of Special Appeals that the typographical error created an ambiguity. In fact, Red Coats moved for summary judgment on the basis that the waiver of subrogation provisions applied to Red Coats as a subcontractor on the Project. On appeal, during arguments before the Court of Special Appeals, in response to the court's questions, counsel for Red Coats confirmed that it was undisputed that the waiver of subrogation provision set forth in the Prime Contract was unambiguous. In its brief before this Court, counsel for Red Coats argued for the first time that the typographical error rendered the clause ambiguous. We shall not consider this issue as it was never raised below. *See* Maryland Rule 8-131(a).

[5] The standard terms of this provision were modified by the parties to the Prime Contract.

6

inside the buildings. Red Coats security officer, Tamika Shelton, was on duty that evening. However, she did not enter the buildings.

At some point during the night and into the early morning, a fire broke out in the building destroying most of the building and causing approximately $17.6 million in damages. The likely cause of the fire was an open flame mushroom heater. Ms. Shelton was alerted to the fire when a police car sped past her parked car. She followed the police and came upon the fire. At trial, Ms. Shelton testified that she never performed an internal sweep of any of the buildings.[6]

## II. PROCEEDINGS BELOW

Upper Rock filed a complaint against Red Coats and Ms. Shelton in the Circuit Court for Montgomery County, in November 2014, alleging that their failure to perform adequate fire watch on March 31–April 1 was a proximate cause of the fire. In August 2015, Red Coats and Ms. Shelton filed a third-party complaint against GCI for contribution.[7] Red Coats alleged that if it was liable to Upper Rock, the third-party defendants were liable to Red Coats for contribution or indemnification.

---

[6] At trial, Red Coats contended that it was never instructed to perform interior checks of the building and that its services were limited to exterior patrols.

[7] In addition to GCI, the third-party complaint named two of GCI's subcontractors as third-party defendants and was later amended to add a third subcontractor. In June 2017, the third-party defendant subcontractors reached a settlement agreement with Red Coats leaving GCI as the sole third-party defendant. The involvement of these three subcontractors, though relevant to the issues that were before the Court of Special Appeals, is immaterial to the issue before this Court.

The circuit court held a motions hearing in April 2016. Among the motions considered at the hearing was Upper Rock's motion for partial summary judgment, in which Upper Rock argued that Red Coats owed it a contractual duty to perform fire watch inside the building, and that Red Coats breached that duty on the night of the fire. The court granted Upper Rock's motion. Next, the court heard GCI's motion for summary judgment. GCI argued, *inter alia*, that it could not be liable for contribution because it could not be liable in tort to Upper Rock under the subrogation/waiver of claims provision in the Prime Contract. The court denied GCI's motion.

After the court granted partial summary judgment against Red Coats on the duty and breach elements of Upper Rock's claims, Red Coats, Upper Rock, and Ms. Shelton entered into a settlement agreement. Pursuant to the settlement agreement, Red Coats agreed to pay Upper Rock the sum of $14 million in exchange for a stipulation of dismissal with prejudice. Red Coats contributed $4 million out of pocket, and its insurer contributed the remaining $10 million. To enable Red Coats to continue to prosecute the contribution action against GCI, the settlement agreement contained an admission of joint tortfeasor status by Red Coats, and a provision fully extinguishing all other joint tortfeasors' liability to Upper Rock.

The contribution action proceeded to a jury trial from May 30 through June 8, 2017. At the close of Red Coats' case-in-chief and again at the close of all the evidence, GCI moved for judgment on the grounds raised in its pretrial motion for summary judgment, namely, that it could not be a joint tortfeasor because it was never directly liable in tort to Upper Rock, the injured party. The court denied the motions, and the case proceeded to a

8

jury to determine the legal question of GCI's joint tortfeasor status. On that issue, the jury found that the Prime Contract's waiver of subrogation/waiver of claims provision did not shield GCI from contribution liability. The jury was also asked to decide whether "the fire that occurred on the evening of March 31–April 1, 2014 [was] a direct result and a foreseeable consequence of [GCI's] negligence?" The jury found that it was. Based upon these findings, the circuit court entered judgment against GCI for contribution in the amount of $7 million—one-half of Red Coats' settlement with Upper Rock.

GCI noted a timely appeal to the Court of Special Appeals. *Gables Constr., Inc. v. Red Coats, Inc.*, 241 Md. App. 1, 21 (2019). Among the issues GCI raised on appeal were: (1) whether GCI is a joint tort-feasor because it had no direct liability in tort to Upper Rock; and (2) whether Red Coats waived its right to recover contribution from GCI toward the $10 million settlement that was paid by its insurer.[8] *Id.* at 8. The Court of Special Appeals held that GCI is a joint tortfeasor under the UCATA. *Id.* at 22. The intermediate appellate court relied upon *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671 (2000), and held that a defense of contractual waiver of subrogation cannot serve as a bar to contribution under the UCATA because "[t]he waiver of subrogation is only germane to the contract and does not spring from the relationship of the parties or the tortious conduct." *Id.* at 26–27. After determining that GCI was a joint tortfeasor, the Court of Special Appeals held that GCI could only be liable for a pro rata share of the $4 million settlement that Red

---

[8] In its appeal to the Court of Special Appeals, GCI presented six questions for review. *Gables Constr., Inc. v. Red Coats, Inc.*, 241 Md. App. 1, 8–9 (2019). The additional questions are not relevant to the single question presented to this Court on *certiorari*.

Coats paid out-of-pocket, because Red Coats contractually waived claims on the $10 million that was paid by its insurer pursuant to the waiver of subrogation provisions contained in the Vendor Services Agreement ("VSA") between Red Coats and GRSI, which was an affiliate of GCI. *Id.* at 38–40. Accordingly, the Court of Special Appeals reduced the judgment against GCI from $7 million to $2 million. *Id.* at 40. Red Coats and GCI both filed petitions for writ of *certiorari*.[9]

We granted GCI's petition to consider the following question:[10]

> Whether a defendant can be liable for joint tortfeasor contribution under the UCATA even though the defendant is not liable to the injured party by virtue of a contractual waiver of claims covered by insurance?

*See Gables Constr., Inc. v. Red Coats, Inc.*, 464 Md. 25 (2019).

As set forth more fully herein, we answer the question in the negative. We hold that a defendant cannot be liable for contribution as a joint tortfeasor under the UCATA if that party is not liable to the injured party in the first instance. Where an injured party's claim is barred by a contractual waiver of subrogation, the third-party defendant is not "liable in

---

[9] Red Coats filed a petition for writ of *certiorari*, asking this Court to determine, *inter alia*, whether the Court of Special Appeals erred in finding that Red Coats waived its contribution claims to the extent that the expenses were covered by insurance. We did not grant Red Coats' petition.

[10] The question presented in GCI's petition for writ of *certiorari* was:

> Whether [the Court of Special Appeals] erred where it held, in this matter of first impression in Maryland, that a defendant can be liable for joint tortfeasor contribution even though it is not liable to the injured person in tort by virtue of a contractual waiver of claims covered by insurance[?]

10

tort" under the plain language of the UCATA, and there is no statutory right to contribution. Under our decades of case law interpreting the UCATA, we have consistently held that the statutory right to contribution is derivative and will not arise where there is no liability to the injured party. We reverse the judgment of the Court of Special Appeals.

## III. DISCUSSION

### A. Standard of Review

The question before the court presents an issue of statutory interpretation—whether GCI is a "joint tortfeasor" as defined in the UCATA. CJ § 3-1401(c). "When the trial court's order 'involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.'" *Nesbit v. Gov't Emp. Ins. Co.*, 382 Md. 65, 72 (2004) (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002)). Thus, we conduct our review of the single question presented *de novo.*

### B. Parties' Contentions

GCI argues that, under the plain language of the UCATA, a statutory claim for contribution only arises where both wrongdoers are "jointly or severally liable in tort for the same injury to person or property." GCI contends that this Court has interpreted the language of the statute in several instances and has held that contribution claims do not arise against a third-party defendant where he or she is not liable to the injured party by virtue of a defense, such as statutory or common law immunity or contributory negligence. GCI argues that the defense of contractual waiver of subrogation should not be treated differently than other defenses which preclude liability to the injured party. GCI contends

11

that this Court's holding in *Montgomery County v. Valk Manufacturing. Co.*, 317 Md. 185 (1989), controls the analysis in this case. GCI asserts that if contribution claims are permitted where a waiver of subrogation bars direct liability to the injured party, such a holding will interfere with important public policy objectives underlying construction contracts where negotiated risks are shifted onto insurance companies, who spread the risk over all insured projects, and will result in duplicative insurance costs to address such potential claims.

In response, Red Coats first contends that GCI failed to preserve its argument concerning its status as a joint tortfeasor under the UCATA. Assuming the issue is preserved, Red Coats argues that the Court of Special Appeals correctly held that the waiver of subrogation in the Prime Contract could not serve as a bar to contribution under the UCATA.[11] Red Coats argues that because it was not a party to the Prime Contract, the

_____

[11] In its brief, Red Coats makes several arguments that were not raised below and are not part of this appeal. Ordinarily, an appellate court will not decide an issue unless "it plainly appears by the record to have been raised in or decided by the trial court . . . ." Md. Rule 8-131(a). The following issues argued by Red Coats were not raised below, and we decline to consider them for the first time on appeal: (1) that GCI failed to meet its burden of proving the affirmative defense because GCI failed to put into evidence the insurance policy or other evidence of insurance coverage; (2) that the subrogation provision is ambiguous because it contains a typographical error referencing Section 11.4 as opposed to Section 11.3; and (3) that this Court should apply principles of equitable and statutory subrogation to hold GCI liable. On the first two unpreserved issues, we point out that not only did Red Coats fail to raise these issues, Red Coats argued the opposite position throughout the proceedings below. In its complaint, Red Coats included paragraphs detailing how Upper Rock purchased a builder's risk policy and how the Prime Contract's subrogation provisions prevent recovery of subrogated damages against GCI. Attempting to obtain the benefit of the waiver of subrogation provisions, Red Coats argued in its motion for summary judgment that it was a subcontractor, and therefore, was entitled to the waiver defense. After the court denied its motion for summary judgment on that issue, Red Coats chose to settle the case rather than present the issue of its subcontractor status

waiver of subrogation cannot apply to its contribution claim. Red Coats also asserts that for purposes of contribution claims arising from the UCATA, this Court should treat the waiver of subrogation defense in a manner similar to a statute of limitations defense.

**C. Analysis**

*Preservation*

We first address Red Coats' contention that GCI failed to preserve its argument concerning its status as a joint tortfeasor. Red Coats contends that GCI failed to renew its motion at the close of all of the evidence and failed to comply with Maryland Rule 2-519(a).[12] We disagree. Prior to trial, GCI filed a pre-trial motion for summary judgment

at trial or on appeal. Red Coats continued its position that the waiver of subrogation provision was unambiguous throughout its appeal to the Court of Special Appeals. At oral argument before the intermediate appellate court, in response to Judge Eyler's question, counsel for Red Coats confirmed that it was not arguing that the waiver clause was ambiguous:

> Judge Eyler: As I understand it as a premise, it's accepted that there was in fact an unambiguous waiver of subrogation clause in that contract. The question then becomes –
>
> Counsel for Red Coats: Correct.

On the issue of whether GCI presented evidence of insurance, even if Red Coats had preserved this issue, we note that where a waiver of subrogation defense is raised, the law does not require proof of insurance actually being purchased, but it is the *promise* to purchase a specified amount of insurance that waives claims up to that amount. *See Gen. Cigar Co. v. Lancaster Leaf Tobacco Co.*, 323 F. Supp. 931, 941 (D. Md. 1971); *Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 550 (1977); *Brodsky v. Princemont Constr. Co.*, 30 Md. App. 569 (1976). Finally, regarding the third issue, we decline to consider new theories of liability that were never pleaded and were raised for the first time in Red Coats' brief to this Court.

[12] Maryland Rule 2-519(a) provides in pertinent part that:

13

on this issue. GCI moved for judgment after Red Coats closed its case in chief. Finally,

the record reflects that, at the close of all the evidence, after responding to Red Coats'

motion for judgment, counsel for GCI made its own motion, stating as follows:

> As to [Red Coats], I would adopt the previous arguments that we made at the time of the motion for judgment. Namely, that . . . one can't pursue a contribution claim unless we owe a duty to Upper Rock, which we do not because they waived that particular duty. I've already made that argument - -
>
> *   *   *
>
> . . . the reason why that duty is waived is because in the construction industry, this is very typical, they waive this duty to us, to the subcontractors to avoid constant litigation about issues just as this . . . .
>
> *   *   *
>
> This is a contribution action which, by definition, means that we both owed a duty to some entity and from that flows our responsibility to them to compensate them for what they paid to somebody to whom we all owe a duty.
>
> *   *   *
>
> . . . they simply can't maintain an action against Gables Construction, Inc. because we are not jointly liable as a matter of law. So, I would adopt those arguments that we made earlier which are included in our brief.

We reject Red Coats' argument that the statements by counsel for GCI set forth above

failed to comply with Maryland Rule 2-519(a). Counsel for GCI adopted its previous

> A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. . . .

14

arguments, including referencing the written memorandum that had been previously filed on this issue. GCI's adoption of its earlier motion for judgment was sufficient to preserve the issue for appellate review. *See Schmidt v. Millhauser*, 212 Md. 585, 589 (1957) (holding that, when a party renews an earlier motion for judgment at the close of the entire case, all issues raised in the earlier motion are preserved). Additionally, as the Court of Special Appeals explained in *Laubach v. Franklin Square Hospital*, 79 Md. App. 203, 216 (1989), *aff'd*, 318 Md. 615 (1990), "upon 'renewal' of a motion for judgment at the close of all the evidence, reference to a memorandum, previously submitted to the court, which sets forth with particularity the arguments in support of the motion is sufficient compliance with Maryland Rule 2-519(a)." *Id.* at 216; *see also K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 153 (1989) (holding that the movant satisfied the requirement by renewing the judgment "[o]n all the same bases," without "tak[ing] the [c]ourt's time to argue further"). In addition to renewing its earlier motion and referencing the previously submitted memorandum, and as further evidenced by the statements of counsel set forth above, GCI clearly argued at the close of all of the evidence that it cannot be a joint tortfeasor because of the waiver of claims in the Prime Contract. GCI complied with Maryland Rule 2-519(a). We agree with the Court of Special Appeals that the issue is preserved for review.

### *Joint Tortfeasor Liability and Contribution Under the Common Law*

We start our analysis with the common law principles of joint tortfeasor liability and the right of contribution between joint tortfeasors, or lack thereof, under common law.

The concept of a "joint tortfeasor" originates from the notion that a single injury can result from the joint actions of two or more individuals, who, putting aside defenses, may

15

be jointly and severally liable. W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 41, at 268 (5th ed. 1984) (hereinafter "Prosser and Keeton"). "Each individual is severally liable for the entire damage, regardless of whether the conduct of one directly caused more or less injury compared to that of another, because they acted together with a common purpose resulting in responsibility for the common injury." *Mercy Med. Ctr. v. Julian*, 429 Md. 348, 354 (2012) (citations omitted).

Although more than one tortfeasor may be jointly and severally liable to the injured party for the entire damage, under English common law, the right of contribution was unavailable among joint tortfeasors. *Valk*, 317 Md. at 189. Accordingly, the one who paid damages and discharged the claim of the injured party was precluded from spreading the loss among the joint tortfeasors. Prosser and Keeton, § 50, at 337–38. The genesis of this prohibition was the case of *Merryweather v. Nixan*, 8 Term. Rep. 186, 101 Eng. Rep. 1337 (1799), in which the Kings Bench held that contribution was barred where "two parties acted intentionally and in concert against the plaintiff." *Valk*, 317 Md. at 189. Early American courts followed the English common law prohibition of contribution in cases of willful misconduct, and extended *Merryweather*, to bar negligent joint tortfeasor contribution actions. *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 684–85 (2000); *see, e.g., Balt. & Ohio R.R. Co. v. Howard Cty.*, 113 Md. 404, 414 (1910).

The common law bar against contribution was criticized as being unjust, and came under sharp attack from courts and commentators alike:

> "There is obvious lack of sense and justice in a rule which permits the entire burden of loss, for which two defendants were equally, unintentionally responsible, to be shouldered

16

onto one alone, according to the accident of a successful levy of execution, the existence of liability insurance, the plaintiff's whim or spite, or the plaintiff's collusion with the wrongdoer, while the latter goes scot free."

*Valk*, 317 Md. at 189 (citing Prosser and Keeton, § 50, 337–38).

### *The Right to Contribution Among Joint Tortfeasors Under The UCATA*

To remedy the inherent unfairness arising from the common law prohibition against contribution among joint tortfeasors, in 1939, the National Conference of Commissioners on Uniform State Laws ("Commissioners") passed the Uniform Contribution Among Joint Tortfeasors Act. *Valk*, 317 Md. at 190–91. In 1941, the Maryland General Assembly "enacted a modified version of the UCATA." *Id.* at 190. As this Court explained shortly after its passage, "[t]he primary purpose of the [UCATA] was to create a right of contribution among joint tortfeasors which did not exist at common law . . . and to establish a procedure whereby that right might be made effective in practice." *Id.* (citing *Balt. Transit Co. v. State ex rel. Schriefer*, 183 Md. 674, 679 (1944)). Although the uniform law was revised in 1955, "Maryland retained, for the most part, the version it originally adopted."[13] *Id.*

Under the UCATA, "[t]he right of contribution exists among joint tort[]feasors." CJ § 3-1402(a). The statute defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment

---

[13] As the Court explained in *Valk*, "Maryland's only substantive revision of the Act has been alteration and then abrogation of the third party practice provision originally contained in the UCATA." *Montgomery Cty. v. Valk Mfg. Co.*, 317 Md. 185, 190–91 (1989). "Now third party practice in contribution cases is regulated by Maryland Rule 2-332 . . . ." *Id.* at 191.

has been recovered against all or some of them." CJ § 3-1401(c). The right to contribution under the UCATA is predicated on a third-party's direct liability to the plaintiff. *See Valk*, 317 Md. at 199. "A joint tortfeasor must be legally responsible to the plaintiff for his or her injuries." *Id.* at 200. This right is also inchoate, until one joint tortfeasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability. CJ § 3-1402(b); *Valk*, 317 Md. at 191.

The issue in this case is whether GCI falls within the definition of "joint tortfeasor" as defined by the UCATA. CJ § 3-1401(c). Red Coats, having entered into a settlement agreement with the injured party, Upper Rock, is only entitled to contribution from "another joint tort[]feasor whose liability to the injured person is . . . extinguished by the settlement." CJ § 3-1402(c). For Red Coats to have a claim for contribution, GCI must fall within the statutory definition of "joint tortfeasor," and must be "jointly or severally *liable in tort* for the same injury to person or property[.]" CJ § 3-1401(c) (emphasis added). Because Red Coats' statutory right to contribution only arises if GCI is "liable in tort" to Upper Rock, we must consider GCI's liability to Upper Rock for damages arising from the fire in the context of the contractual provisions between them.

### Prime Contract Between Upper Rock and GCI

As noted above, Upper Rock and GCI utilized the AIA standard form contract A102™–2007, Standard Form of Agreement between Owner and Contract, and A201™–2007, General Conditions of the Contract for Construction, as the Prime Contract. Given the widespread use of the AIA standard contracts in the construction industry, in the context

18

of our analysis, it is important to consider the policy behind the insurance provisions and allocation of risk that have been included in the standard forms for over 100 years.

*AIA Construction Contracts Generally*

The standard form contracts published by the AIA are the most widely used and generally accepted standard contract forms in use within the construction industry. *See* 4 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 5:2 (2002) (hereinafter "Bruner & O'Connor") (noting that AIA documents are the "most widely used construction forms in the country. One of the primary reasons for the success of the AIA contract forms has been the perception in the industry that these forms strike a good balance between the interests of the owner, contractor and design professional"); *see also Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co.*, 231 Md. App. 27, 34 n.3 (2016), *aff'd*, 454 Md. 698 (2017) (internal citations omitted) ("The American Institute of Architects is an organization which, among other things, '[s]ets the industry standard in contract documents with more than 100 forms and contracts used in the design and construction industry.'").

Since at least 1915, the AIA standard form contracts for use by owners and contractors have included property insurance provisions requiring the owner to procure and maintain a policy of insurance on the project. The American Institute of Architects, The General Conditions of the Contract (2d ed. 1915).[14] In their book *The A.I.A. Standard*

---

[14] Article 21 of the 1915 edition of the General Conditions of the Contract, as published by the American Institute of Architects, included the following:

*Contract Forms and the Law*, William Stanley Parker and Feneuil Adams described the

risk-shifting concepts embedded in the early versions of AIA standard form contracts, as

follows:

> It has been held by some that absolute protection can be better assured by inserting in the contract between the Owner and Contractor a provision that the Owner shall not be liable to the Contractor and Subcontractors and that they shall not be liable to the Owner for any act which may result in a loss from fire (or from extended coverage if that may be provided for) in connection with the Contract either during or after completion of the Contract.  The insurer, in paying a loss to the Owner, obtains by subrogation all rights of recovery that the Owner may have against third parties.  If the Owner, in the Contract, has waived all rights against the Contractor and Subcontractors, then the insurer has none, and cannot proceed against them.

> The Owner shall effect and maintain fire insurance upon the entire structure on which the work of this contract is to be done and upon all materials, tools and appliances in or adjacent thereto and intended for use thereon, to at least eighty per cent of the insurable value thereof.  The loss, if any, is to be made adjustable with and payable to the Owner . . . .

> All policies shall be open to inspection by the Contractor.  If the Owner fails to show them on request or if he fails to effect or maintain insurance as above, the Contractor may insure his own interest and charge the cost thereof to the Owner.  If the Contractor is damaged by failure of the Owner to maintain such insurance, he may recover under Art. 39.

American Institute of Architects, The General Conditions of the Contract 4 (2d ed. 1915), https://perma.cc/TJY8-PUE4.

Article 39 provided that the contractor "shall be reimbursed by [the owner] for such damage." *Id.* at 7.

William Stanley Parker & Feneuil Adams*, The A.I.A. Standard Contract Forms and the Law* 47 (1954).

Through the standard provisions addressing insurance coverage and waivers, the drafters have attempted to address a multitude of risks associated with a construction project, including the risks that are typically covered by first-party property insurance. On a ten-year cycle, the contract forms are reviewed and updated to ensure that the documents reflect the best practices of the contracting environment. The American Institute of Architects, AIA Document Commentary for A201™-2007 General Conditions for the Contract for Construction 1 (2007).[15] The AIA Documents Commentary Introduction describes the process as follows:

> Like its predecessors, A201-2007 is the product of many years of discussions involving owners, contractors, subcontractors, architects and engineers, as well as legal and insurance counsel, all of whom shared their recommendations for how to best adapt A201-1997 to serve not only the contracting environment of 2007, but also the foreseeable future. AIA contract documents intend to serve fairly all participants in a design and construction project. Because one party's interests may conflict with another's, the AIA strives to balance those interests through a reasonable apportionment of risks and responsibilities that take into account the best interest of the project. Due to a documents development process that gathers and analyzes input from across the design and construction industry, including the wide distribution of draft agreements and face-to-face debate, no one party's interests are allowed to dominate.

---

[15] https://perma.cc/4ZRT-RJFN.

*Id.* As stated in the Commentary, "[t]he purpose of the required property insurance is to transfer the risk of insured losses from the owner and contractor to the insurance company." *Id.* at 46.

The contractual provisions which require property insurance, together with a waiver of subrogation,[16] shift the risk/loss to the insurer, thereby spreading the risk among the universe of covered projects which pay an appropriate insurance premium. By spreading the risk, the cost of insuring any individual project involves a small fraction of the cost of a potential loss.

> *Waiver of Subrogation Defense—Recognition of the General Public Policy in Maryland Jurisprudence*

This Court has recognized that the right to a claim of subrogation may be waived through a contractual waiver of subrogation. *See, e.g.*, *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 319 (2010). We have previously noted that waivers of subrogation are "prevalent in construction contracts." *Id.* at 319. The waiver acts as "'a risk-shifting provision premised upon the recognition that it is economically inefficient for parties to a contract to insure against the same risk.'" *Id.* (quoting *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.3d 562, 567 (Tex. App. 2007)).

---

[16] The doctrine of subrogation "is a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person." *Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 412 (1989) (citing *Harford Bank v. Hopper's Estate*, 169 Md. 314, 324 (1935)). The doctrine is "founded upon the equitable powers of the court," and its rationale is "to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt." *Id.* "Ordinarily, in the insurance context, pursuant to a contract, the subrogee insurer is subrogated to the insured, against a party who has caused the insured's loss and for which the insurer has compensated his insured." *Poteet v. Sauter*, 136 Md. App. 383, 401–02 (2001).

In *John L. Mattingly Construction Co. v. Hartford Underwriters Insurance Co.*, we observed that, as a matter of policy, waivers of subrogation serve many beneficial purposes, including "encourag[ing] parties to a construction contract to anticipate risks and procure insurance covering those risks[,] . . . facilitat[ing] and preserv[ing] economic relations and activity[,] . . . and cut[ting] down the amount of litigation that might otherwise arise due to the existence of an insured loss." *Id.* at 319 (citations omitted) (cleaned up).

Additionally, construction contracts containing waiver of subrogation clauses "'often contain provisions which require the parties to waive their right to claim damages against one another up to the amount of insurance coverage available for their losses.'" *Id.* (quoting *Bruner & O'Connor*, § 11:100); *see also Gen. Cigar Co. v. Lancaster Leaf Tobacco Co.*, 323 F. Supp. 931, 941 (D. Md. 1971) (observing that numerous authorities recognize "that where parties to a business transaction mutually agree that insurance will be provided as part of the bargain, such agreement must be construed as providing mutual exculpation to the bargaining parties who must be deemed to have agreed to look solely to the insurance in the event of loss and not to the liability on the part of the opposing party"); *Brodsky v. Princemont Constr. Co.*, 30 Md. App. 569, 576–77 (1976) (holding that a waiver of subrogation by the parties to a construction contract "contemplated that the risk of damage to the property by fire would be covered by insurance, and not by either of the parties").

*Contractual Waiver of Subrogation Between Upper Rock and GCI*

As noted *supra*, the parties to the Prime Contract retained the language in the AIA standard form contract relating to the purchase of property insurance, and they retained the

23

fundamental concepts contained in a related waiver of subrogation, as those provisions had been drafted by the AIA. Under the terms of the Prime Contract, Upper Rock contractually agreed to purchase and maintain "all-risk" property insurance, which included "insurance against the perils of fire," Prime Contract, § 11.3.1.1, "in the amount of the . . . total value for the entire Project . . . on a replacement cost basis," *id.* § 11.3.1, and to pay the cost of any required policy deductibles as a "Cost of the Work." *Id.* § 11.3.1.3. Additionally, pursuant to § 11.3.7 of the Prime Contract, titled "WAIVERS OF SUBROGATION," Upper Rock waived all of its rights against GCI and other participants in the project for "damages caused by fire or other causes of loss to the extent covered by property insurance . . . ." *Id.* at §11.3.7. Those provisions placed the responsibility on Upper Rock, as the owner, to purchase and maintain a policy of property insurance on the work being performed. The waiver of subrogation provision provided that Upper Rock (and any subrogated property insurer) waive all rights against GCI, and other project participants such as subcontractors, for damages cause by fire or other causes of loss to the extent covered by property insurance.

Because of the contractual waiver, neither Upper Rock, nor its insurer, had a claim against GCI for fire-related damages. The contractual defense of waiver precluded Upper Rock's claims against GCI from arising in the first instance. Turning to Red Coats, as set forth below, because Red Coats' statutory claim for contribution is not an independent right, but is a derivative right flowing from Upper Rock, under our established case law, Red Coats has no right of contribution because GCI was not "liable in tort" to the injured party.

24

***The UCATA Requires Legal Responsibility to an Injured Party, not Mere Culpability,***
***for a Contribution Claim***

Although the specific issue in this case—whether a defendant can be held liable for contribution as a joint tortfeasor under the UCATA where the defendant is not liable to the injured party by virtue of a contractual waiver—is one of first impression, this is not the first instance where this Court has considered the terms "liable in tort" and "common liability" as they are used in the UCATA. Specifically, this Court has construed the language of the statute in the context of interspousal immunity (*see Ennis v. Donovan*, 222 Md. 536, 540 (1960)); workers' compensation immunity (*see Balt. Transit Co. v. State ex rel. Schriefer*, 183 Md. 674, 679 (1944)); and contributory negligence (*see Montgomery Cty. v. Valk Mfg. Co.*, 317 Md. 185, 190–91 (1989)). Given our extensive discussion and interpretation of the phrase "liable in tort" in other contexts of other defenses, rather than re-plow old ground, we examine our prior holdings. In each such instance, we held that there is no right of contribution under the UCATA where the injured person has no right of action against the third-party defendant. For the reasons set forth below, we see no reason to deviate from our consistent interpretation of the plain language of the UCATA and carve out a new interpretation where the defendant's direct liability to an injured party is barred by contractual waiver as opposed to an immunity or contributory negligence defense.

In *Baltimore Transit Co. v. State ex rel. Schriefer*, this Court first considered the UCATA's definition of a joint tortfeasor under the 1939 version of the UCATA. 183 Md. at 680. There, the defendants filed a third-party claim against the county as the plaintiff's

employer. *Id.* at 676. However, the Workers' Compensation Act provided the employer immunity from suit. *Id.* at 678. We reviewed the Commissioners' notes in adopting the UCATA to better understand the common liability that the General Assembly contemplated required a right to contribution. The notes stated that:

> 'The common obligation contemplated by this Act is the common liability of the Tortfeasors to suffer adverse judgment at the instance of the injured person whether or not the injured person elects to impose it.' . . . [T]he Act 'permits contribution among all tortfeasors whom the injured party could hold liable jointly and severally for the same damage or injury.'

*Id.* at 680. In holding that the defendants could not file a third-party complaint against the employer because of the employer immunity conferred by the Workers' Compensation Act, we reasoned that the Commissioner's notes clearly contemplated that "there can be no contribution where the injured person has no right of action against the third-party defendant. The right of contribution is a derivative right and not a new cause of action." *Id.* at 679.

In *Ennis v. Donovan*, we recognized where spousal immunity bars liability to the injured party, there is no right to contribution under the UCATA.[17] 222 Md. at 540, *abrogated by Bozman v. Bozman*, 376 Md. 461 (2003). In *Ennis*, Mr. Donovan and his wife were in a car accident in which their vehicle collided with Mr. Ennis's car, which

---

[17] In *Bozman v. Bozman*, 376 Md. 461, 467–68 (2003), this Court abrogated interspousal immunity, finding that the doctrine was antiquated and no longer remained useful given evolving societal norms. Although we no longer recognize *Ennis v. Donovan*, 222 Md. 536 (1960), as good law with respect to interspousal immunity, the case continues to provide an explanation of the UCATA and the necessity of common liability to the injured person.

26

resulted in Mrs. Donovan's death. *Id.* at 538. Mr. Donovan filed suit against Mr. Ennis on behalf of his wife's estate. *Id.* Subsequently, Mr. Ennis filed third-party claims against Mr. Donovan under the UCATA alleging that Mr. Donovan was also liable for the collision. *Id.* Mr. Ennis's suit turned on whether Mrs. Donovan could have maintained a suit against her husband. *Id.* at 539. At the time, this Court recognized the doctrine of interspousal immunity, which prevented a married woman from suing her husband in tort. *Id.* at 540. This Court held that, because Mrs. Donovan could not have maintained a suit against her husband, there was no common liability among Mr. Donovan and Mr. Ennis under the UCATA. *Id.* at 539–43.

In *Montgomery County v. Valk Manufacturing Co.,* this Court considered the right of contribution where an otherwise legally culpable party had no obligation to the injured party because of the defense of contributory negligence. 317 Md. at 197–98. In that case, the survivors of a motorist who was killed in a collision with a snow plow operated by a Montgomery County employee filed a wrongful death action against the county, and a strict liability action against the manufacturer of the snow plow's hitch. *Id.* at 186–87. The manufacturer filed a cross-claim against the county for contribution. *Id.* at 188. The trial court determined that the deceased motorist was contributorily negligent and dismissed both the plaintiff's direct claim and the manufacturer's claim against the county. *Id.* at 187–88. Because contributory negligence does not bar strict liability claims, the plaintiff's claims against the manufacturer were considered by a jury. *Id.* at 188. The jury found the manufacturer "liable for creating a defective and unreasonably dangerous snow plow design" and awarded the plaintiff $2.5 million in damages. *Id.* The manufacturer appealed,

27

arguing that its cross-claim against the county was improperly dismissed. *Id.* The Court of Special Appeals agreed, holding that "'[t]he facts only established that the contributory negligence of [the decedent] precluded his representatives from doing anything about that fault. It would not, however, preclude others from seeking proper redress.'" *Id.* (quoting *Valk Mfg. v. Rangaswamy*, 74 Md. App. 304, 329–30 (1988)).

This Court granted *certiorari* to consider whether a right of contribution exists where the county could not be liable to the plaintiff for damages because of the decedent's contributory negligence. *Id.* at 189. We concluded that no right of contribution existed under the circumstances. *Id.* at 187. In reaching our holding, we explained the crux of the dispute as follows:

> We now consider the meaning of the terms "liable in tort" and "common liability" as they are used in the UCATA. If they denote *mere culpability* to the plaintiff for a wrong, then the County might be considered a joint tortfeasor and subject to contribution. If the terms denote *legal responsibility* to the plaintiff for a wrong, the County is not a joint tortfeasor and is therefore not subject to contribution.

*Id.* at 191–92 (emphasis added). As part of our analysis whether "liable in tort" and "common liability" meant mere culpability or legal responsibility, we reviewed our holdings in other cases where we held that there was no contribution when the injured party had no right of action against the third-party defendant. *Id.* at 192–200.

Specifically, we observed that we had found that there was no right of contribution under the UCATA in the context of interspousal immunity and workers' compensation immunity. *Id.* at 192–93 (citing *Schriefer*, 183 Md. at 680; *Ennis*, 222 Md. at 540). We explained that in *Ennis*, we held that because the plaintiff/passenger was barred by

28

interspousal immunity from directly suing her husband, who was driving at the time of the collision, the defendant could not sue her husband indirectly for contribution. *Id.* at 192. We "reasoned that the UCATA 'is only applicable to a situation where there is a common liability to an injured person in tort. There can be no contribution where the injured person has no right of action against the third party defendant.'" *Id.* (quoting *Ennis*, 222 Md. at 540) (additional internal citations omitted) (cleaned up).

Similarly, we explained that in *Schriefer*, we "barred contribution where the third party defendant was an employer who had achieved immunity through compliance with the Work[ers'] Compensation Act." *Id.* In reaching that conclusion, we explained that in reaching our holding in *Schriefer*, we relied on the Commissioner's notes to the 1939 version of the UCATA. *Id.* at 192–93. We again observed that the notes reflected that "'[t]he common obligation contemplated by this Act is the common liability of the tortfeasors to suffer adverse judgment at the instance of the injured person whether or not the injured person elects to impose it.'" *Id.* at 193 (quoting *Schriefer*, 183 Md. at 680). We commented that the notes further reflected that the Act "'permits contribution among all tortfeasors whom the injured party could hold liable jointly and severally for the same damage or injury.'" *Id.* (quoting *Schriefer*, 183 Md. at 680). Once again, we concluded that "[t]hese comments clearly reflect the Act's assumption that contribution from a third[-]party defendant is predicated on his or her direct liability to the plaintiff." *Id.* We also noted that in subsequent cases, we described *Schriefer* as holding "that there [is] no right of contribution where the injured person has no right of action against the third[-]party defendant." *Id.* (citing *Stem v. Nello L. Teer Co.*, 213 Md. 132, 142 (1957)).

After reviewing Maryland case law, the language and purpose of the UCATA, as well as cases for other UCATA jurisdictions, this Court stated "the 'traditional view is that there can be no contribution between concurrent tortfeasors unless they share a 'common legal liability' toward the plaintiff . . . . The contribution action arises from the original obligation that the party cast in contribution owed to the plaintiff.'" *Id.* at 195 (citing *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1434 (5th Cir. 1988)). Because liability under the UCATA is predicated on liability to the injured person, "[a] joint tortfeasor must be legally responsible to the [injured party] for his or her injuries." *Id.* at 199–200.

In *Valk*, we concluded that

> contribution under the UCATA as enacted in Maryland is predicated on a wrongdoer's direct liability to the plaintiff. *Where the law, as in this case, shields one of two wrongdoers with the defense of contributory negligence, the UCATA does not currently remove that shield.* In the future, the legislature may allow contribution either by altering the UCATA or by abrogating or limiting such shields as contributory negligence . . . .
>
> But until that time, we are bound to abide by the statute as it is written. Under the statute, contribution is available only among joint tortfeasors. A joint tortfeasor must be legally responsible to the plaintiff for his or her injuries.

*Id.* at 199–200 (emphasis added) (internal citations omitted).

To summarize our holdings, in Maryland, *any defense* arising from the moment of the wrongdoing,[18] which precludes legal responsibility to the injured party, also precludes

---

[18] As discussed *infra*, for purposes of contribution claims, we treat the statute of limitations defense differently. Where the defense arises from a statute of limitations, liability attaches in the first instance, and the defense is dependent upon litigation

liability for contribution under the UCATA. *See id.* at 199 (explaining that, "'[i]f there was never any liability [to the plaintiff], as where the contribution defendant has the defense of family immunity, assumption of the risk, or the application of an automobile guest statute, or the substitution of workers' compensation for common law liability, then there is no liability for contribution'") (quoting Prosser and Keeton § 50 at 339–40).

Just like the above-described defenses arising from immunity and contributory negligence, the defense of contractual waiver also acts as a complete bar to recovery by Upper Rock. Upper Rock contractually waived its rights against GCI for damages by fire to the extent covered by property insurance. GCI cannot be held liable to Upper Rock. Because GCI does not have common liability with Red Coats to Upper Rock, it does not fall within the definition of "joint tortfeasor" under the statute, and Red Coats has no right of contribution against GCI.

We see no reason to deviate from our longstanding jurisprudence and interpret the plain language of the UCATA in a different and inconsistent manner for a defense arising from a contractual waiver of subrogation. We interpret the plain language of the UCATA statute in the same manner regardless of the nature of the type of defense arising from the moment of wrongdoing. "Liable in tort to the injured party" means the same thing, regardless of whether the defense is created by statute, common law, or by contract. As we noted in *Valk*, if the Legislature wishes to expand the right to contribution under the

---

maneuvers transpiring after the injury occurs. *See Montgomery Cty. v. Valk Mfg. Co.*, 317 Md. 185 n.16 (1989).

UCATA, it may do so. *See id.* at 199–200 ("But until that time, we are bound to abide by the statute as it is written.").

The United States District Court for the District of Maryland took a similar approach in *Hartford Fire Ins. Co. v. Ninja Jump, Inc.*, No. CCB-17-0183, 2017 WL 2335599 *6 (D. Md. May 30, 2017), holding that under Maryland law, a contractual waiver arising from a lease agreement barred a subrogation claim for contribution for damages arising from a fire under the UCATA. In *Ninja Jump*, a building owned by Mary M. Martin suffered fire damage and her insurer, Hartford Fire Insurance Company, compensated her for the losses. *Id.* at *1. Hartford Fire then initiated a subrogation action against Jumpy Bounce, LLC, which leased the building from Ms. Martin, and Ninja Jump, Inc., which provided equipment to Jumpy Bounce. *Id.* at *1–2. In turn, Ninja Jump filed a cross-claim against Jumpy Bounce for contribution or indemnification. *Id.* at *1. The lease between Ms. Martin and Jumpy Bounce contained provisions whereby Ms. Martin agreed to fully insure the building against fire loss and waived all claims against Jumpy Bounce in the event of a fire. *Id.* at *2. Jumpy Bounce moved to dismiss Ninja Jump's contribution claim, arguing that because it was neither liable to Ms. Martin nor Hartford directly, it could not be liable to Ninja Jump for contribution. *Id.* at *3. Applying the UCATA and Maryland case law, the court agreed, stating as follows:

> A "joint tort-feasor" must be "legally responsible to the plaintiff for his or her injuries," because "contribution under the UCATA . . . is predicated on a wrongdoer's direct liability to the plaintiff." *Montgomery Cnty. v. Valk Mfg. Co.*, 317 Md. 185 199–200 (1989). For instance, no claim to contribution exists where an alleged "joint tort-feasor" cannot be held liable in the underlying suit due to certain immunities or the defense

32

of contributory negligence. *See id.* at 192–95, 199. One exception to this general rule relates to the statute of limitations defense. . . . The Court of Appeals has suggested that the statute of limitations defense is distinct, because that defense does not "arise out of the wrongdoing itself" but rather "depends on litigation procedures transpiring after the wrongdoing has occurred." *Id.* (quoting *Valk*, 317 Md. at 198 n.16).

Here, the lease negotiated by Martin and Jumpy Bounce precludes Hartford Fire's subrogation claim against Jumpy Bounce. Liability never arose in the first instance, because Jumpy Bounce and Martin agreed that Martin would not hold Jumpy Bounce liable in the event of negligently caused fire damage. Because Hartford Fire has no right of action against Jumpy Bounce, Ninja Jump's contribution claim against Jumpy Bounce is necessarily precluded.

*Id.* at *6. We agree with the court's analysis in *Ninja Jump* that there is "no basis in Maryland law" to create "a new exception to the general rule that a contribution claim fails unless the party from whom contribution is sought is legally liable to the plaintiff in the underlying suit[]" for a "'defense to liability arising in a private contract between the plaintiff and a joint tortfeasor.'" *Id.* at *6 n.6.

Red Coats argues that the Court of Special Appeals correctly relied upon *Parler & Wobber v. Miles & Stockbridge, P.C.*, 359 Md. 671 (2000), in reaching its holding that the contractual defense of waiver of subrogation did not bar Red Coats' claim for contribution. As set forth below, *Parler* is inapposite to the single issue presented in this case.

In *Parler*, a client brought a legal malpractice action against its former counsel, Miles & Stockbridge, P.C. ("Miles"). *Id.* at 677. Miles then impleaded successor counsel, Parler & Wobber, LLP ("Parler"), for contribution and indemnification. *Id.* at 678. Parler argued that it was immune from Miles's contribution action not because it lacked legal

33

responsibility to the plaintiff, but because defending itself against Miles would require it to violate the attorney-client privilege. *Id.* at 682–83.

*Parler* was a certified question in which the Court focused on the balance between the joint tortfeasor's statutory right to contribution and public policy considerations arising from attorney-client privilege in the context of a legal malpractice claim. *Id.* at 676, 681. Unlike a contractual waiver of subrogation, the attorney-client privilege is not a defense to a direct suit by the injured party. Parler argued that for "public policy reasons," this Court should find that Parler could not be liable for contribution under the UCATA because to allow such a claim would "open Pandora's box by providing a third party with the right to interfere in the sacred attorney-client relationship." *Id.* at 683. Significantly, the focus of the Court's inquiry was *not* whether Parler had direct liability to its client (thereby creating a statutory cause of action in favor of its joint tortfeasor for contribution), but whether the Court should recognize an "exception" to the statutory right of contribution under the UCATA for public policy reasons to preserve the attorney-client privilege. *Id.* at 682.

In *Parler*, we refused to carve out an exception "from this statutory cause of action [] and its historical underpinnings" where there is a perceived threat to the attorney-client privilege. *Id.* at 687, 704–05. In analyzing this issue, the Court focused on the attorney-client privilege in the context of malpractice claims, and stated that "[t]he question in this case is whether we should extend the implied waiver rule more broadly to attorney-client privileged communications between the client and successor counsel when the client, by claiming malpractice or negligence against former counsel, has injected an issue that also implicates successor counsel's negligence in the same matter." *Id.* at 693. After discussing

34

cases from other states, we determined that the record in *Parler* supported "an implied waiver of the attorney-client privilege as to all the attorneys who were involved in defending the [clients] in the underlying litigation." *Id.* at 700 (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 580 (E.D. Wash. 1975)). We further pointed out that, "[i]mportantly, this Court also has held that attorneys who act negligently in settlement proceedings should be held accountable to the client for their actions." *Id.* at 704 (citing *Thomas v. Bethea*, 351 Md. 513, 528–30 (1998)). We concluded that "[p]rohibiting a joint tortfeasor action in this case would open an undesirable loophole in *Thomas* and circumvent [the] UCATA's purpose." *Id.* at 704.

Contrary to the assertion made by Red Coats and the Court of Special Appeals' reasoning below, *Parler* is not controlling, nor does it alter our holding in *Valk* and our earlier cases that under the plain language of the UCATA, there is no right of contribution where the injured person has no right of action against the third-party defendant. *See Gables Constr., Inc.*, 241 Md. App. at 26–27 (noting that GCI argues that *Valk* controls, while Red Coats counters that *Parler* controls, but the court "agree[d] with Red Coats."). Indeed, in *Parler*, we reiterated our holding expressed in *Valk* that "liable in tort" requires direct liability to the plaintiff:

> We have held that, in situations where only one potential defendant is sued by a plaintiff, that defendant's right to contribution from a third party is predicated on the impleaded party's direct liability to the plaintiff. *See Valk*, 317 Md. at 193. This means that as between a defendant and an impleaded party, there must be common liability in tort to an injured person. *See Valk*, 317 Md. at 192; 1 Stuart M. Speiser, et al., The American Law of Torts § 3:21, at 455 (1983, 2000 Supp.). *Courts and commentators have been careful to note a*

35

> *distinction between common liability and joint negligence.* "Contribution rests on common liability, not on joint negligence or joint tort. Common liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds." In this sense, contribution is derivative in nature rather than a new cause of action. *See Valk*, 317 Md. at 192.

*Id.* at 686–87 (emphasis added) (some citations omitted) (cleaned up). Nothing in *Parler* eroded our holding in *Valk* that under the statutory definition of "joint tortfeasor," a defendant's right to contribution from a third party is predicated on the impleaded party's direct liability to the plaintiff.[19]

Red Coats urges this Court to adopt the reasoning of the Court of Special Appeals and hold that a defense arising from waiver of subrogation is different from other historical

---

[19] In attempting to distinguish our holding in *Valk*, the Court of Special Appeals reasoned that "[i]n *Valk*, . . . the Court of Appeals noted both a reluctance to carve out exceptions to [the] UCATA and that immunities were 'on the wane.'" *Gables Constr., Inc. v. Red Coats, Inc.*, 241 Md. App. 1, 31 (2019) (quoting *Valk*, 317 Md. at 196). The Court of Special Appeals misinterprets our discussion in *Valk* as signaling a reluctance to follow the plain language of the UCATA statute, rather than adherence. In *Valk*, this Court's discussion concerning immunity defenses being "on the wane" was a reference to some minority jurisdictions that allowed contribution despite family immunity. We commented that those jurisdictions "do not primarily rely on the language of the UCATA or the Commissioners' notes." *Valk*, 317 Md. at 194–97. By contrast, consistent with our precedent, this Court refused to "carve out exceptions" from the plain language of the UCATA to allow a claim for contribution where a tort defense shields the defendant from liability to the injured party. *See Valk*, 317 Md. at 199–200 (explaining that where a valid defense shields a wrongdoer from liability, a claim for contribution will not lie because the plain language of "the UCATA does not currently remove that shield. In the future, the legislature may allow contribution by either altering the UCATA or by abrogating or limiting such shields as contributory negligence . . . . But until that time, we are bound to abide by the statute as it is written."). As discussed *supra*, just as the Court was unwilling to carve out an exception for the defense of contributory negligence from the plain language of the UCATA statute by judicial declaration, we are unwilling to carve out an exception for a defense of contractual waiver of subrogation.

bars to contribution.  For the reasons set forth below, we do not agree that the defense of waiver of subrogation must be treated differently under the plain language of the UCATA and the Commissioners' notes.

First, the Court of Special Appeals attempted to distinguish the contractual waiver defense by explaining that "immunity and contributory negligence arise from the wrongdoing itself[,]" quoting *Valk*, 317 Md. at 197 n.16,[20] whereas, "[b]y contrast, the waiver of subrogation here stems from a contractual agreement formed long before the harm occurred." *Gables Constr., Inc.*, 241 Md. App. at 30–31.  We are not persuaded that this distinction provides a reason to treat the defenses differently under the plain language of the UCATA.  In either instance, the defense creates a bar to liability to the injured party which arises from the moment the injury occurs.  We do not view the waiver of subrogation any differently than an immunity defense arising under the workers' compensation statute.  Neither defense arises from the wrongdoing.  Rather, both defenses are preexisting conditions that may be asserted from the moment the injury occurs.  In either instance, the defendant is not "liable in tort."

---

[20] The language cited by this Court explained the difference between defenses arising from the wrongdoing itself, and the defense of statute of limitations. *See Valk*, 317 Md. at 197 n.16.  As set forth *infra*, this Court has refused to allow a statute of limitations defense to act as a bar to contribution because that defense "depends on litigation procedures transpiring after the wrongdoing has occurred." *Id.*  In the case of limitations, the third-party defendant could have been held liable to the plaintiff before the statute ran— the plaintiff simply chose not to impose the obligation. *Balt. Transit Co. v. State ex rel. Schriefer*, 183 Md. 674, 680 (1944).  Unlike the statute of limitations defense, a contractual waiver of subrogation is negotiated *prior to* any injury or damage and the defense arises at the instance the injury occurs whether or not the injured person elects to impose it.

Next, the Court of Special Appeals attempted to distinguish a defense arising from a waiver of subrogation from other defenses, based upon the fact that Red Coats was not a party to the Prime Contract. The intermediate appellate court reasoned that:

> A contract is binding only upon the parties to the contract and their privies. Bars to contribution such as contributory negligence and family immunity are enforceable against the world at large. By contrast, GCI's and Upper Rock's waiver of subrogation is only enforceable as to the parties to the contract and does not apply to Red Coats. As such, we hold that a contractual waiver of subrogation does not extinguish the right to contribution of a joint tortfeasor who has not bound itself to that provision of the contract.

*Id.* at 31 (internal citations and quotations omitted). We disagree with the Court of Special Appeals' reasoning. The fact that Red Coats was not a party to the Prime Contract does not create a basis for the Court to ignore the plain language of the UCATA and this Court's decades-long consistent interpretation of the same. The sentiment expressed by the Court of Special Appeals in the above-quoted language is that Upper Rock and GCI should not be able to contractually interfere with Red Coats right to contribution. However, this analysis misses a key point—under the UCATA, Red Coats *has no original right to contribution.* As this Court explained in *Valk*, and reaffirmed in *Parler*, "[t]here can be no contribution unless the injured person has a right of action in tort against both the party seeking contribution and the party from whom contribution is sought. The right of contribution is a derivative right and not a new cause of action." *Valk*, 317 Md. at 197 n.14 (citations omitted); *see also Parler*, 359 Md. at 687–88 (citations omitted) ("'Contribution rests on common liability, not on joint negligence or joint tort.' . . . In this sense, contribution is derivative in nature rather than a new cause of action."). Because Red

38

Coats' right to contribution is derivative, the fact that Red Coats was not a party to the contract has no bearing on our analysis. The analysis under the statute focuses on the liability to the injured party, not a common relationship among all three parties.

Further, we disagree with Red Coats and the Court of Special Appeals that under our holding "contracting parties would be able to return to the pre-UCATA days[] [and] could create a chilling effect on business relationships if the new normal is to insulate business entities from liability and contribution claims." *Gables Constr., Inc.*, 241 Md. App. at 32. As set forth above, there are public policy reasons for permitting contracting parties to execute waivers of subrogation to shift risks. *See John Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 319 (2010). Allowing contribution claims where a third-party defendant has a defense arising from a contractual waiver of subrogation will defeat the risk-shifting benefits and protections arising from such contracts. We do not anticipate any chilling effect on business transactions arising from our holding. Indeed, a contrary holding would frustrate the risk-shifting provisions that are routinely negotiated in construction contracts and would create duplicate and inefficient insurance obligations. *Id.* (noting that the waiver acts as a risk shifting provision premised on the recognition that it is economically inefficient for parties to a insure against the same risk).

Finally, Red Coats argues that we should treat a contractual defense of waiver in the same manner as a defense arising from statute of limitations. Where the bar to liability arises from the failure to give notice within the required period, contribution remains available. *See Cotham v. Bd. of Cty. Comm'rs for Prince George's Cty.*, 260 Md. 556

39

(1971), superseded by statute on other grounds in *Leppo v. State Highway Admin.*, 330 Md. 416 (1993) (concluding that the failure of the plaintiff to give notice within 180 days to one defendant did not bar the second defendant from indemnifying the other defendant).

As we explained in *Valk*, we treat statute of limitations differently from other defenses because where a claim is barred by statute of limitations, liability still arose in the first instance. *Valk*, 317 Md. at 197 n.16. The statute of limitations depends on the litigation procedures arising *after* the harm where the party is liable. *Id.*

We decline to treat a defense arising from a contractual waiver of subrogation in the same manner as a defense arising from a statute of limitations. Waivers of subrogation are not litigation maneuvers used to manipulate the outcome after the harm occurs. Upper Rock and GCI contractually agreed to the waiver *prior to the injury*. Unlike a defense arising from statute of limitations, liability never attached to the wrongdoing in the first instance. The wrongdoing triggered the waiver's effect, just as the wrongdoing triggers a defense of contributory negligence or statutory immunity. For a defense arising out of a contractual defense of waiver of subrogation, we shall continue to interpret the plain language of the UCATA in the same manner as other defenses to liability which apply from the moment of the wrongdoing.

## IV. CONCLUSION

For a statutory claim of contribution under the UCATA, parties must be joint tortfeasors. Under our decades of jurisprudence interpreting UCATA, a joint tortfeasor must be liable in tort to the injured party. "Liable in tort" requires legal responsibility and common liability, not mere culpability to the injured party for a wrong. We have repeatedly

40

held in other cases that there is no right of contribution where the injured person has no right of action against the third-party defendant. The statutory right to contribution is not an independent cause of action, but is a derivative right arising out of common liability to the injured party. We decline to carve out an exception from the plain language of the UCATA by treating the contractual defense of waiver of subrogation differently from other statutory and common law defenses such as immunities and contributory negligence.

GCI cannot be liable in tort to Upper Rock because the waiver of subrogation prevented liability from arising in any instance. Without liability to the injured party, the UCATA does not provide for a right to contribution. Accordingly, we hold that Red Coats cannot prevail on a claim of contribution under the UCATA.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

41